571 F.2d 880
 UNITED STATES of America, Plaintiff-Appellee,
v.
James Alford ELLIOTT, Jr., Robert Ervin Delph, Jr., William
Marion Foster, Recea Howell Hawkins, John Clayburn
Hawkins, Jr., a/k/a J. C. and John Frank
Taylor, Defendants-Appellants.
 No. 76-3678.
 United States Court of Appeals,
Fifth Circuit.
 April 21, 1978.
Rehearing and Rehearing En Banc Denied June 2, 1978.
 
 Denmark Groover, Jr., Frank H. Childs, Jr., Macon, Ga., for Elliott.
 Deryl D. Dantzler, Macon, Ga., for Taylor and Delph.
 Joseph H. Davis, David B. Higdon, Macon, Ga., for Foster.
 Oscar B. Goodman, Las Vegas, Nev., for Recea Howell Hawkins and John Clayburn Hawkins, Jr.
 John D. Carey, Joseph M. Lawless, Asst. U. S. Attys., Macon, Ga., D. L. Rampey, Jr., U. S. Atty., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Georgia.
 Before AINSWORTH, SIMPSON and MORGAN, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 In this case we deal with the question of whether and, if so, how a free society can protect itself when groups of people, through division of labor, specialization, diversification, complexity of organization, and the accumulation of capital, turn crime into an ongoing business. Congress fired a telling shot at organized crime when it passed the Racketeer Influenced and Corrupt Organizations Act of 1970, popularly known as RICO. 18 U.S.C. §§ 1961 et seq. (1970). Since the enactment of RICO, the federal courts, guided by constitutional and legislative dictates, have been responsible for perfecting the weapons in society's arsenal against criminal confederacies.
 
 
 2
 Today we review the convictions of six persons accused of conspiring to violate the RICO statute, two of whom were also accused and convicted of substantive RICO violations. The government admits that in this prosecution it has attempted to achieve a broader application of RICO than has heretofore been sanctioned. Predictably, the government and the defendants differ as to what this case is about. According to the defendants, what we are dealing with is a leg, a tail, a trunk, an ear separate entities unaffected by RICO proscriptions. The government, on the other hand, asserts that we have come eyeball to eyeball with a single creature of behemoth proportions, securely within RICO's grasp. After a careful, if laborious study of the facts and the law, we accept, with minor exceptions, the government's view. Because of the complicated nature of this case, both factually and doctrinally, a detailed explication of the facts and of the reasoning underlying our conclusions must be undertaken.
 
 I. THE FACTS
 
 3
 Simply stated, this is a case involving a group of persons informally associated with the purpose of profiting from criminal activity. The facts giving rise to this generalization, however, are considerably more complex. Evidence presented during the 12 day trial implicated the six defendants and 37 unindicted co-conspirators in more than 20 different criminal endeavors. Because the jury found the defendants guilty as charged, with two exceptions, we proceed on the assumption that all relevant credibility choices were made in favor of the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The facts can most clearly be set forth by focusing on specific episodes, arranged in roughly chronological order.
 
 A. 1970, Act One: Arson:
 
 4
 The history of the first Community Convalescent Nursing Home in Sparta, Georgia, began when defendant William Marion Foster encouraged a group of 34 blacks to invest in the project and ended several months later when the completed but unoccupied home was burned to the ground at Foster's behest. The second Community Convalescent Nursing Home was then built, at a profit, by Foster's construction company.
 
 
 5
 Foster, who had been in the construction and nursing home business, arranged for an SBA loan to the B. F. Hubert Development Corporation, comprised of 34 blacks. In expressing his willingness to help, Foster noted that SBA loans were available but that, tragically, many blacks did not know how to secure them. Foster set up a corporation, Community Convalescent Center, Inc., to lease the nursing home from the B. F. Hubert group. Construction on the home was completed in the summer of 1970, after which James E. McMullen, a coowner of the leasing corporation, worked to ready the home for its scheduled opening on December 4, 1970. On the evening of December 2, Foster ordered McMullen to fire the night watchman, Tommy Barnes.[1] The next night McMullen and his wife worked at the home until 11:00 p. m., when they left, locking the doors behind them. Within hours, the front door of the home was unlocked, and gasoline and explosives were strewn through the halls and ignited. An investigation by the Georgia State Fire Marshal's Office reached the conclusion that the fire was intentionally set, but the perpetrators were never caught.
 
 
 6
 The crime might have remained unsolved had it not been for admissions made three years later by Foster and codefendant John Clayburn Hawkins, ironically nicknamed "J. C.". Foster and J. C. had been attempting to elicit the cooperation of their friend and occasional business associate James Gunnells in the concealment of a stolen shipment of meat and dairy products (an incident discussed later in this opinion). To show that he and J. C. were serious, Foster told Gunnells that he had paid J. C. and his brother, Recea Hawkins also a codefendant $4500 to burn the Community Convalescent Nursing Home. Gunnells, who was also in the nursing home business, replied that there was nothing in a nursing home to burn. J. C. explained that he had used three 55 gallon drums of gasoline and one drum of naphtha and had no problem in starting the fire.
 
 B. Counterfeit Titles/Stolen Cars:
 
 7
 From mid-1971 until at least the end of 1974, J. C. Hawkins and codefendants Robert Ervin Delph, Jr., and John Frank Taylor furnished counterfeit titles to and helped sell cars stolen by a major car theft ring operating in and near Atlanta, Georgia.
 
 
 8
 J. C. procured 200 counterfeit Georgia certificates of title in mid-1971 by furnishing negatives of titles to a Macon printer, Marvin Farr. After printing the 200 titles, Farr destroyed the negatives and the plates and buried the remains in his back yard. J. C. had also commissioned Farr to print books of state vehicle inspection stickers, for which he again furnished the negatives. Farr, however, was unable to complete the order because he could not devise a way to apply adhesive to the stickers. After a visit from J. C. during which J. C. demanded the inspection stickers "or else", T. 851, Farr left town. He was later arrested in Denton, Texas, and returned to Macon on state counterfeiting charges. In Macon he was contacted by Abe Crosby, an attorney and unindicted co-conspirator in this case. Crosby told Farr that he had been sent by people that Farr "was scared of" and that J. C. Hawkins wanted Farr to keep his mouth shut. After his release from jail, Farr was visited at his place of employment by J. C., who told him that he, Farr, was crazy "and that nobody talked about (J.C.) and got away with it". T. 856.
 
 
 9
 The car theft ring was comprised of Billy Royce Jackson, James A. Green, and Kenneth Sutton Boyd, all convicted car thieves and key witnesses for the prosecution in this case. Each testified that on several occasions he purchased counterfeit certificates of title from Delph and Taylor for $25 or $50 apiece. Green and Boyd testified that Delph and Taylor more than once identified their source of counterfeit titles as a man named "J. C." in Macon.[2] Similarly, Larry Estes, a cousin of James Gunnells, purchased several counterfeit titles from J. C., both directly and through a middleman, Joe Breland. Green testified that in 1972 and 1973, he stole cars on request for Delph and Taylor. In the late summer or early fall of 1974, J. C. visited Green at the furniture store where Green was employed and asked him to steal two cars. Over the next year, Green stole several cars for J. C., at $400 per car. Recea Hawkins often accompanied his brother to pick up and pay for the cars.
 
 
 10
 Titles printed by Farr and distributed by J. C. were recovered in Alabama, California, Florida, Georgia, North Carolina, and Texas in connection with investigations of car thefts. In some cases, however, J. C. was able to recapture both car and title before either fell into the hands of the police. One such episode involved Benjamin F. Chester, Jr., who leased from J. C. a lounge adjacent to a liquor store owned and run by J. C. In 1971, J. C. sold Chester three cars "wholesale" and furnished the certificates of title. Chester, in turn, sold one of the cars to Raymond Booker. Instead of having Chester sign his title over to Booker, J. C. simply furnished Booker with a new "title". In July 1972, J. C. met with Chester and Booker at the lounge and demanded that the cars and titles be returned because they had "got hot". T. 1007. Booker recalled no threats from J. C., only the statement, "I've got to have my car back so y'all don't be hard headed". Chester, however, was reluctant to return his cars and remembered that J. C. finally stated, "I tell you what, if you don't give me them cars back, I will kill you myself or I will have you killed". Both men returned their cars and titles.
 
 C. Stolen Hormel Meat:
 
 11
 On March 30, 1972, a truckload of approximately 33,000 pounds of Hormel meat packed in cardboard boxes left the packing plant in Fremont, Nebraska, consigned to the Alterman Food Company in Atlanta, Georgia. The trailer carrying the shipment arrived in Smyrna, Georgia, late that night and was parked at the South Cobb Service Station to be picked up by another driver, Byron Moseley, for ultimate delivery on April 2. At 3:00 p. m. on April 1, Moseley observed the tractor-trailer parked at the service station. By 9:00 that evening, it had been stolen.[3] The abandoned tractor was found beside a highway south of Atlanta the following day. About one month later, the empty trailer was recovered in Warner Robbins, Georgia.
 
 
 12
 On the night of April 1, 1972, J. C. Hawkins visited Rudolph Flanders at Flanders' grocery store, the Pick and Carry. J. C. asked if he could store boxes of Hormel Meat in the cooler of the Pick and Carry, and Flanders consented. Over the next few days, J. C. stored 40 to 50 boxes of meat which he sold with some assistance from Flanders. At some point that month, J. C. offered to sell a "semi-trailer truck" of meat to Larry Sykes for $7,000. Sykes contacted his brother, who was in the meat packing business, and was advised to pass up the deal because the meat "was just too low priced". T. 769. At about the same time, codefendant James Alford Elliott, Jr., sold a 50 pound piece of Hormel meat to Joe Fuchs, then a pharmacist in Macon. Fuchs returned the meat after he learned from a butcher friend that it was not "legitimate".[4] A year later, shortly before Rudolph Flanders was tried in federal court for possession of the stolen Hormel meat, J. C. told James Gunnells that "it was his (J. C.'s) load of meat", that he had purchased it for approximately $10,000, and that Recea Hawkins was also involved in the transaction.
 
 
 13
 D. Efforts to Influence the Outcome of the Stolen Meat Trial:
 
 
 14
 Rudolph Flanders' trial for possession of the stolen interstate shipment of meat took place during the first week of May, 1973. Days before the trial, Flanders met with J. C., Gunnells, and others, in the coffee shop of the old Grady Hotel in Macon. At the meeting, the jury list for Flanders' trial was passed around to "see who we knew on it and who we could talk to". T. 237. J. C. recognized one name on the list, James Elliott, as that of a young man who lived behind him. He indicated that he was certain Elliott would cooperate if he were on the jury. Elliott was selected as a juror at Flanders' trial and, alone among the other 11 jurors, voted for acquittal, causing a mistrial.[5]
 
 
 15
 E. September, 1973: A Truck Theft and Its Aftermath:
 
 
 16
 On September 24, 1973, a Caterpillar front-end loader and a Ford dump truck were stolen from a construction site near Atlanta. That night, J. C. Hawkins appeared at the Eubanks Tire and Battery Company near Macon to purchase a new tire for the stolen dump truck. He gave his name as "Roy Evans", and remained on the opposite side of the highway in a brown Buick while Tommy Ellison, an employee of Eubanks, changed the tire.
 
 
 17
 In the pre-dawn hours of the following day, September 25, Terry Singleton, a Bibb County Sheriff's Deputy, received a call from Jimmy Reeves. Reeves stated that J. C. had just telephoned him and asked him to go to the Waffle House at the intersection of I-475 and U. S. 80. Singleton and his partner, Jim Reid, conducted a surveillance of the Waffle House, where they observed J. C. with a light blue Continental Mark IV and Reeves, in his pick-up truck. Eventually, Reeves' truck left the Waffle House, proceeding west on U. S. 80. Singleton saw the truck slow down and flash its left turn signal near an underpass, but it never executed the turn. Within an hour, Singleton called Reeves to learn what had happened. Reeves reported that he drove J. C. along U. S. 80 so that J. C. could show him where the dump truck and front-end loader were hidden, but that just as he was about to turn left to reach the spot, J. C. observed a marked patrol car and was "spooked". Singleton drove to the area described by Reeves and found the stolen equipment. On January 21, 1974, J. C. was indicted in state court for the theft of the dump truck and front-end loader.
 
 
 18
 1. The Murder of Jimmy Reeves: In the spring of 1974, J. C. and Gunnells had discussed the purchase of antique watches and guns from Jimmy Reeves. One night in April or May of that year, J. C. received a call at his home in the presence of Gunnells. After the call, J. C. told Gunnells that they should be glad they had not done business with Reeves, whom J. C. then described as a "finking son of a bitch". Later that night, during a conversation about the state theft charges pending against him, J. C. commented to Gunnells that "they wouldn't have a witness".
 
 
 19
 Early on the morning of May 27, 1974, Reeves received a telephone call. He left his home in his pick-up truck immediately after the call, explaining to his wife and children that he did not have time to eat breakfast. At 8:40 that morning, in a church yard not far from his home, Reeves' body was found lying on the floor board of his truck. He had been killed by three 16-gauge shotgun blasts using Number One buckshot. Extensive powder burns associated with two of Reeves' wounds indicated that they had been inflicted at a "very close" range. T. 556-57.
 
 
 20
 Two or three days after the Reeves murder, Gunnells was present at J. C.'s house and overheard a conversation between J. C. and his brother, Recea. J. C. asked, "How did it go?", to which Recea responded, "First shot out of the barrel and he didn't even know what happened didn't even see it coming". Recea explained that he was "real sure" because he was "close enough for powder burns". T. 321. Other evidence circumstantially linking Recea to the Reeves murder came from an eyewitness who observed a dark blue car parked on a dirt road near the church yard shortly before 8:00 on the morning of the murder. In May, 1974, Recea owned a 1968 or 1969 dark blue Pontiac.
 
 
 21
 2. The Intimidation of Tommy Ellison: In September 1974, one year after he sold a tire to "Roy Evans", Ellison was approached at his place of work in Griffin, Georgia, by two black men who offered to drive him to Atlanta to "have some fun". Ellison explained that he could only go on a rainy day, when he would not be required to work. About a week later, on a rainy day, the men returned and drove Ellison to Atlanta in a Lincoln Continental with two pistols lying on the front seat. During the ride, the men offered Ellison $150 to make a statement that he did not know "a friend of theirs". Ellison agreed. In Atlanta, he was taken to the office of Charles E. Clark, an attorney, where he signed a sworn statement reading, in part, as follows:
 
 
 22
 Upon being introduced to a man called J. C. HAWKINS, I noticed immediately that this was not the man to whom I gave tire service on the night of September 24, 1973. The man that I observed at the Eubanks Tire Center was several inches taller and weighed more than this man. I have never seen the man introduced to me as J. C. Hawkins before in my life.
 
 
 23
 According to Ellison, this statement was false. After signing it, he was introduced to J. C., who had been waiting in another office. J. C. said, "I appreciate what you did and my friends will take care of you, what they promised you", and gave Ellison a drink of liquor. The two black men then drove Ellison back to Griffin, but paid him only $25.
 
 F. Stolen Swift Meat and Dairy Products:
 
 24
 On October 19, 1973, a tractor-trailer load of swinging beef, pork, veal, and lamb, and boxes of butter and cheese was shipped from Nashville, Tennessee, aboard a Thompkins Motor Lines refrigerated trailer. The shipment was driven to a terminal in Decatur, Georgia, where it was parked temporarily. At some point over the next two days, the tractor and trailer were stolen by Milton Burnett and Bill Rainey. On October 24, the abandoned tractor was discovered near Forest Park, Georgia; the loaded trailer had been sold to J. C. in Macon.
 
 
 25
 The first problem confronting J. C. was where to store the large quantity of meat and dairy products that he had illicitly acquired. The stolen goods probably would have been kept at three nursing homes owned by Foster had it not been for a fortuitous series of events the month before. In September, 1973, Foster learned that the Georgia Bank was about to foreclose on his nursing homes in Sparta, Lumber City, and La Grange. To avoid losing the homes, Foster went into business with James Gunnells, who loaned him approximately $60,000. Foster, in turn, leased the homes to Gunnells, effective October 1, 1973. Consequently, before Foster could use the nursing homes for his own purposes, he had to secure Gunnells' permission.
 
 
 26
 On October 24, 1973, Foster and J. C. spoke to Gunnells in Foster's office. J. C. stated that he had "a semi-truckload of swinging beef" parked at a truck stop on Gray Highway and that he needed a place to store it. A "deal" that J. C. and Foster had on the meat had fallen through, and now they wanted Gunnells to release his leases on the nursing homes so that Foster could have access to their refrigeration units. Gunnells refused. J. C. told Gunnells that he was "a goddamn fool" and that, if he did not cooperate, he would lose $8,500 that he had loaned to Foster over the past two days.[6] Foster called Gunnells "silly" and explained that "he could trust J. C. completely". At this point Foster related how he had paid J. C. and Recea Hawkins $4,500 to burn the Sparta nursing home in 1970. Finally, pressed by J. C. to come up with a place to put the meat, Gunnells suggested that they move the trailer to the farm of his friend, Howard Wooden.
 
 
 27
 That night, J. C. drove the tractor-trailer to Wooden's farm off Interstate Highway 75 near Perry, Georgia, south of Macon. There, J. C., Wooden, Gunnells, and Larry Estes tried unsuccessfully to back the trailer into Wooden's barn. At about 2:30 a. m. the next day, October 25, the four men drove the van to an open field adjoining I-75 farther south, and left it there for the night. After daybreak, J. C. and Estes drove the van back to Wooden's farm. With Wooden and Gunnells, they unloaded the stolen meat and dairy products into an old ice cream truck and a U-Haul van rented by J. C. that day in Macon.
 
 
 28
 On October 26, Estes drove the U-Haul van to a grocery store in Jeffersonville, Georgia, which was owned by Foster and had been closed for about one year. There he met Foster and Larry Hudson, a mechanic employed as Gunnells' "general flunky". After Hudson, at Foster's request, turned on the store's old freezers, the three men began unloading the U-Haul van. At that point, a state patrol or local police car pulled up outside the store. Foster spoke to the officer, who soon left. Foster then told Estes and Hudson that he did not want the meat and cheese at his store, so they reloaded the van and drove to J. C.'s house in Macon, where they were able to fit some of the goods into an old chest-type freezer on J. C.'s back porch. The next day Foster told Gunnells that a law enforcement officer had caught him with the meat but that he, Foster, had "out-talked him". T. 290. The remainder of the stolen meat, butter, and cheese was sold to the owner of a supermarket in Charlotte, North Carolina, by Paul Moose, Jr., at the request of Leon Averett.[7]
 
 
 29
 G. Stolen Forklift and Ditchwitch: Honor Among Thieves:
 
 
 30
 J. C. believed that he had been shortchanged by Rainey and Burnett in that he paid for but did not receive a full trailer load of meat and dairy products. He demanded and received a partial refund. Instead of paying in cash, however, Rainey and Burnett made good on their obligation by delivering to J. C. a stolen forklift and ditchwitch. At about the same time in November, 1973, Foster told J. C. that he needed a forklift at one of his construction projects. In the presence of James Gunnells, J. C. told Foster that he could save money by buying the "hot" equipment, from him for $3,500. Foster bought the two pieces of equipment, knowing they were stolen. He got less than a bargain, however. The forklift developed mechanical problems, and remained at the construction site for only two months before Foster had it moved to his backyard in Jeffersonville, where his children used it as a springboard for their trampoline. The forklift remained at Foster's home for nine months until it was confiscated by the Georgia Bureau of Investigation.[8]
 
 H. Stolen "Career Club" Shirts:
 
 31
 On November 7, 1973, a trailer load of "Career Club" shirts consigned to an interstate shipment and valued in excess of $56,000 was stolen from the Roadway Express Terminal in Macon. The trailer, on which the name "Roadway" was painted in tall, bold letters along each side, wound up in an Atlanta warehouse built and owned by Foster.
 
 
 32
 The lessons of the stolen meat experience the month before apparently were not lost on Foster. Two years earlier he had entered into a business venture with Kenneth Lamar Keyes, a glass installer, to construct a warehouse-type building for Keyes to rent for use as a glass processing plant. The building, located in Atlanta, was completed during the summer of 1973 and had doors large enough for semi-trucks and trailers to pass through. As of November, 1973, no equipment had been installed. That month, Foster asked Keyes if he could rent the building to someone for two or three months, ostensibly to help defray interest payments on the money borrowed to finance the building. Keyes consented. A few days after he was contacted by Foster, Keyes, along with his stepson, Kenneth Horace Johnson, witnessed J. C. and two other men drive up to the warehouse, pry the locks off the surrounding gate with a crowbar, and replace them with new locks. Several days later Keyes and Johnson looked inside the warehouse and found the 40 foot Roadway trailer. Within a week the trailer was gone, a pile of U-Haul blankets left in its stead.
 
 
 33
 Gunnells, by his account, was unwittingly drawn into the stolen shirt episode by Foster. First, as a Christmas present, Foster gave Gunnells approximately 25 of the stolen shirts.[9] When Gunnells later learned that the shirts were stolen, he returned all but one to J. C. and Recea Hawkins. The one remaining shirt, which he turned over to the Bibb County Police, was introduced into evidence in the instant case and was identified as a part of the stolen shipment. Second, Foster asked Gunnells to take some polaroid photographs of the outside of his Atlanta warehouse. Gunnells travelled to Atlanta with J. C. and Recea for this purpose. At the warehouse, J. C. unlocked the gate and the office door, showed Gunnells the trailer and its contents, and offered to sell him shirts for one dollar apiece. As they were leaving the warehouse, Gunnells noticed a police car parked across the street but was told by J. C. not to worry. On his return to Macon, Gunnells approached Foster to register his concern over what had happened in Atlanta. Foster explained that "there wasn't nothing to worry about, that he had a lease drawed up showing that he had leased it to somebody if anything ever happened". T. 307.
 
 
 34
 Like the meat and dairy products the month before, the stolen shirts were eventually disposed of through Leon Averett and Paul Moose, Jr. in Charlotte, North Carolina. In connection with the sale of the shirts, Averett told Moose that "they" had a warehouse in Atlanta big enough to handle several tractor-trailers. Some of the shirts sold by Averett and Moose were recovered and identified as part of the stolen shipment.
 
 I. O False Apothecaries$:
 
 35
 With the exception of Foster, all defendants were implicated in a number of illegal drug transactions throughout the period covered by the indictment. We list those transactions chronologically.
 
 
 36
 1. 1971-72: Elliott Barters in Black Beauties: Early in 1971, Joe Fuchs, then a pharmacist in Macon, wished to have a screened enclosure built around his porch. According to Fuchs, James Elliott suggested that Joe Breland could do the work at a low price. He and Breland went to Fuchs' house, where Elliott negotiated a deal, requesting payment in amphetamine pills, popularly known as "black beauties". Fuchs agreed, and the work was completed over the period of a year, during which time Fuchs gave the pills to Elliott and Breland in installments of 400.[10]
 
 
 37
 2. 1972-73: Amphetamine Sales: In early 1972, shortly after their counterfeit title transactions commenced, Robert Delph began selling amphetamines to car thief Jim Green. Green recalled approximately six occasions on which he purchased 1,000 pills from Delph for $150. Kenneth Boyd, also a member of the car theft ring, accompanied Green to Delph's house during the first transaction, and later became a steady customer. For a period of eight months beginning in the summer of 1972, Boyd bought somewhere between 1,000 and 10,000 pills from Delph at two week intervals. Boyd also purchased amphetamines from defendant Taylor in similar quantities at one month intervals for about one year, beginning in the summer of 1972. According to Boyd, both Delph and Taylor on several occasions identified their source of pills as J. C. Hawkins. Knowing that the pills supplied to him were not pharmaceutical, Boyd was concerned about their source because uniformity of quality was an important factor in their resale value. During one conversation, Boyd pressed Delph for details about his source of pills. Delph, who had been drinking, eventually stated that "he had a truck that he was running for J. C. and that they was partners in the deal or some kind of operation or setup". T. 1275-76.
 
 
 38
 3. Winter 1973: The Jamaican Conspiracy: In November 1972, J. C. approached his friend Harry Randall in Macon about purchasing marihuana and amphetamines in Jamaica. Randall at the time owned a car rental business in Kingston, Jamaica. He contacted his Kingston associate, Dillon Barnes. Barnes flew to Macon where he, J. C. and Randall, after protracted negotiations, reached an agreement as to their general plan: Barnes would return to Kingston to set up the purchase of 300 pounds of marihuana and 200 pounds of amphetamine powder, Randall would then fly down to make the purchase and arrange for transportation to the United States; J. C. would pay for and distribute the drugs. By coincidence, during this period, J. C. and James Gunnells were interested in purchasing a piece of property in Macon owned by the Tweedles, a couple who lived in Jamaica. When Randall finally flew to Jamaica in January, 1973, to purchase the drugs, J. C. asked him to contact the Tweedles to negotiate the sale of their Macon property. J. C. arranged for Randall's trip to be paid for by Gunnells, who knew nothing of the drug conspiracy. Randall travelled to Jamaica, set up the deal and wired home for $1,500, which was sent by Western Union but never received by Randall. The drug deal fell through when Randall learned that the pilot he had recruited to fly the illicit goods back to Macon was an agent for the Drug Enforcement Administration.
 
 
 39
 4. Spring 1973: The Canadian Conspiracy: During the spring of 1973, Delph and Taylor met with James Green to discuss a plan to bring large quantities of amphetamine powder and MDA into the United States from Canada. Delph and Taylor stated that they planned to travel to Canada where they knew a chemist who could supply the drugs, and asked Green to assist them in selling whatever they were able to bring back. Soon thereafter, Delph and Taylor drove to Canada and returned with powdered amphetamine and MDA which they sold to Green for $125 per ounce and which Green resold to a single individual for $150 per ounce.
 
 
 40
 5. Fall 1973: The Mexican Conspiracy: In late October or early November, 1973, William Maxwell Martin, who was peripherally involved in the car theft ring, was introduced to Taylor by Billy Royce Jackson, a member of the ring. After Jackson arranged to purchase a counterfeit certificate of title from Taylor, Martin asked Taylor if he would be interested in buying several tons of marihuana. Taylor stated that marihuana required too much space in transportation and asked if Martin could obtain heroin or cocaine, noting that others with whom he was involved "had just got through purchasing an airplane for $102,000 to bring heroin to this country". T. 1196. Martin and Jackson, already planning to go to Mexico in search of marihuana, agreed to look for heroin and cocaine for Taylor. The two never reached Mexico, however; they were arrested en route in Laredo, Texas, on Dyer Act charges of transporting a stolen vehicle across state lines. After his arrest, Martin agreed to cooperate with the Drug Enforcement Agency. From his hotel room in Laredo and in the presence of DEA agents, Martin called Taylor and stated that he was out of jail and in Mexico and that he could put a deal together as discussed. According to Martin, Taylor "said that he was hoping that we could, that he wanted to do some checking, and for me to get back with him later". T. 1195. Martin, however, was unable to contact Taylor again. The single telephone call from Martin's hotel room went unrecorded due to a malfunction in the DEA's recording equipment.
 
 
 41
 6. 1973: Miscellaneous Drug Transactions: In addition to the major drug deals, successful and unsuccessful, of 1973, the evidence disclosed several minor, isolated drug transactions that year. In the spring of 1973, Joe Breland purchased a bottle of "speed" from J. C. at one of Foster's construction sites. At about the same time, J. C. invited Joe Fuchs to his house to rummage through his stash of illegally obtained prescription drugs. Fuchs noted that most of the drugs were "normal prescription type medication" with no street value and thus of no interest to him. J. C. explained that "Scooter" Herring had recently been through those drugs and had picked out what he wanted, so that only a few controlled drugs were left.[11] Fuchs found four to six bottles of Ritalin, a Schedule II controlled substance, which he bought from J. C. for $250. Additionally, Billy Royce Jackson recalled that sometime in 1973 he was given about 25 amphetamine pills by Delph.
 
 
 42
 7. 1974: MDA: Early in 1974, J. C. approached Larry Estes and offered to sell him MDA, explaining that he had two pounds on hand and needed some money. Estes promised to check at a local nightclub to see if he could find a buyer. Within a week, Estes called J. C. and stated that he had found someone interested in purchasing MDA. At J. C.'s suggestion, Estes went to Recea's motorcycle shop in Macon and told Recea that he could sell one ounce of MDA for $350. Recea told Estes to walk down the road for a while and that when he returned, the MDA would be under the front seat of a particular car parked outside the shop. After picking up the MDA in this manner, Estes returned to his apartment, where his potential buyer sampled the product and paid $350 for the tiny plastic bag of grayish-brown powder. Estes then delivered the money to Recea. Over the next two weeks, Estes made two more sales for Recea using the same procedure. On April 27, 1974, Macon police raided the apartment of Recea's estranged wife, Patricia Thomas, and seized approximately 364 grams of 245 trimethoxyamphetamine, a controlled substance similar to MDA. Although keys to the apartment were possessed by Recea Hawkins, Ricky Strozier and Patricia Thomas, the latter two denied any knowledge of the seized drugs.[12]
 
 
 43
 8. 1976: Marihuana: In May, 1976, J. C. met with Bob Day, a pilot and an old friend. With Day's consent, the meeting was surreptitiously recorded by agents of the Georgia Bureau of Investigation, and relevant portions of the tape were admitted into evidence at the trial. At one point in this conversation, J. C. admitted to Day that three to five weeks earlier, "we got 200 pounds" of "goddamn, jam-up good" marihuana. Soon thereafter, J. C.'s narrative statement continued, J. C. and his unnamed compatriots purchased but returned another 200 pounds which were not as good. They then purchased 300 pounds of marihuana, which they sold within two weeks although it too was of low quality. T. 2210.
 
 
 44
 9. 1976: The Hawkins-Day Conspiracy: In April, 1976, J. C. met with Day and Kevin Sapp at Day's home in Dawson, Georgia, to discuss two criminal schemes, one of which involved a marihuana deal J. C. claimed to be working on in "New Mexico". At the meeting, J. C. offered Day $10 per pound to fly a minimum of 500 pounds of marihuana from "New Mexico" to Georgia. The next month, Day, wired for sound, visited J. C. in Macon to discuss their plans. J. C. raised the possibility of importing a large quantity of marihuana from Colombia, South America, by ship because "the quality right now in Mexico is lousy". If Day knew of a ship that was available, J. C. stated, he had someone willing to invest over a million dollars. As for airplanes, "I done blowed three or four years' salary in the last three or four years fucking with them airplanes. Almost everyone that's come from down there has got caught, has got jumped". When Day described a shrimp boat for sale, J. C. replied that such a boat "is not big enough to haul what I'm talking about, 50,000 pounds".
 
 J. Epilogue: The Bravo Plot:
 
 45
 Months after he knew that a federal grand jury was hot on his trail, J. C. continued to devise criminal money-making schemes, as his tape recorded conversation with Bob Day reveals. In addition to marihuana deals, J. C. planned to burglarize the Triangle Chemical Company in Macon and steal approximately 2,000 five gallon cans of "Bravo", a fungicide used to dust crops during the summer months. In April, 1976, J. C. solicited the help of Day and Kevin Sapp in this endeavor, the details of which were discussed the following month in the taped conversation between J. C. and Day. J. C. stated that he already had the trucks necessary to carry the 60 pound chemical drums a tractor-trailer and two "six-wheelers". He then outlined a plan to assure that the eventual buyer would be unaware of J. C.'s and Kevin Sapp's involvement and that Sapp, apparently an employee of Triangle, would be unaware of the identity of the buyer.
 
 
 46
 J. C.'s modus operandi, as reflected in this arrangement, was based on the mistaken notion that a person could not be convicted on the basis of only one co-conspirator's testimony.[13] J. C. thus assumed and often advised others that he would be sheltered from liability if he could deal with only one other person at each phase of a particular transaction. His explanation to Day is illustrative:
 
 
 47
 HAWKINS: They won't never be more than two people together on your end of it. So you and the guy you deal, you and me.
 
 
 48
 DAY: I'd just rather deal with you . . .
 
 
 49
 HAWKINS: You go deal with your man by yourself and you tell him what you want him to know.
 
 
 50
 DAY: That's right. You just don't tell Calvin (sic) that I was nowhere around or nothing.
 
 
 51
 HAWKINS: Naw, but he'll know in his own mind that you
 
 DAY: I think he will too, but
 
 52
 HAWKINS: That don't mean nothing. Even in court if he said you was, that's nothing. Your word's as good as his. T. 2234.
 
 
 53
 As for his own liability, J. C. told Day that the buyer "can pay you direct and you can pay me, and you'll never see anybody else. That's my word against yours . . . That don't even bother me . . . One on one ain't worth a shit".[14] T. 2226.
 
 II. THE INDICTMENT
 
 54
 The eight count indictment in this case was returned on July 29, 1976, superseding an almost identical indictment filed on June 10, 1976. The indictment charged the following:
 
 
 55
 COUNT ONE: Conspiracy to Violate RICO: All six defendants, James Alford Elliott, Jr., Robert Ervin Delph, Jr., William Marion Foster, Recea Howell Hawkins, John Clayburn Hawkins, Jr. a/k/a J. C., and John Frank Taylor, were named in Count One as having conspired, from December 3, 1970, until the filing of the indictment, with each other, with 37 unindicted co-conspirators, and with "others to the grand jury known and unknown" to violate a substantive provision of the RICO statute, 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).[15] The essence of the conspiracy charge was that the defendants agreed to participate, directly and indirectly, in the conduct of the affairs of an "enterprise" whose purposes were to commit thefts, "fence" stolen property, illegally traffic in narcotics, obstruct justice, and engage in "other criminal activities". The indictment listed 25 overt acts, beginning with the burning of the Community Convalescent Nursing Home in 1970 and culminating with J. C. Hawkins' marihuana transactions in the spring of 1976.
 
 
 56
 COUNT TWO: The Substantive RICO Charge: J. C. and Recea Hawkins only were charged with a substantive violation of the RICO statute, 18 U.S.C. § 1962(c), in that they conducted and participated, directly and indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity. The crimes alleged to satisfy the statutory requirements for "a pattern of racketeering activity" included those charged in Counts Three through Six and Count Eight, as well as the possession and sale of Ritalin and the distribution of MDA on three occasions, all in violation of 21 U.S.C. § 841, the murder of Jimmy Reeves, in violation of Ga. Code Ann. § 26-1101, and the burning of the Community Convalescent Nursing Home, in violation of Ga. Code Ann. § 26-1401.
 
 
 57
 COUNT THREE: J. C. Hawkins was charged with violating 18 U.S.C. §§ 659 and 2 in that he possessed and concealed with the intent to convert to his own use a stolen interstate shipment of Hormel meat valued in excess of $100.
 
 
 58
 COUNT FOUR: J. C. Hawkins and James Elliott were charged with violating 18 U.S.C. §§ 1503 and 2 in that they corruptly endeavored to obstruct justice by "hanging" the jury in the trial of Rudolph Flanders for the possession and concealment of the stolen Hormel meat.
 
 
 59
 COUNT FIVE: J. C. Hawkins and William Marion Foster were charged with violating 18 U.S.C. §§ 659 and 2 in that they possessed and concealed with the intent to convert to their own use a stolen interstate shipment of Swift Premium meat and dairy products valued in excess of $100.
 
 
 60
 COUNT SIX: J. C. Hawkins, Recea Hawkins and Foster were charged with violating 18 U.S.C. §§ 659 and 2 in that they possessed and concealed with the intent to convert to their own use a stolen interstate shipment of "Career Club" shirts valued in excess of $100.
 
 
 61
 COUNT SEVEN: James Elliott was charged with violating 18 U.S.C. § 1503 in that he corruptly endeavored to obstruct justice by encouraging Joe Fuchs to lie to a federal grand jury "investigating theft from interstate shipment of Swift Premium boxed beef". The indictment's reference to "Swift" was erroneous; the boxed beef discussed by Elliott and Fuchs had been produced by Hormel.
 
 
 62
 COUNT EIGHT: J. C. Hawkins was charged with violating 18 U.S.C. § 2315 in that he knowingly received and disposed of a counterfeit security, a Georgia State Certificate of Title, moving in interstate commerce.
 
 
 63
 At the close of the government's case, the trial judge directed a verdict of acquittal on Count Four in favor of James Elliott. The jury acquitted J. C. Hawkins on Count Four and Elliott on Count Seven, thus eliminating all substantive obstruction of justice charges from the case. All remaining defendants were found guilty as charged by the jury under Counts One, Two, Three, Five, Six, and Eight, were adjudged guilty, and received the following sentences: J. C. Hawkins, 80 years imprisonment; Recea Hawkins, 50 years imprisonment; Delph and Taylor, each 10 years, with parole eligibility in 24 months; Foster, one year imprisonment, five years probation; James Elliott, five years probation.
 
 
 64
 In this appeal, the defendants have raised a myriad of issues, all of which we have considered at length. Some are too frivolous to warrant discussion. Others present serious and novel legal questions that we attempt to address and resolve by the discussion which follows.
 
 III. THE SUBSTANTIVE RICO VIOLATION
 
 65
 J. C. and Recea Hawkins contend that their acts, while arguably violative of other criminal statutes, are not proscribed by the substantive RICO provision under which they were charged, 18 U.S.C. § 1962(c), in that they were not committed in furtherance of the affairs of an "enterprise" as required by the Act. At best, they say, the facts disclosed that two brothers confederated to commit a few, isolated criminal acts over a period of six years. Neither the facts nor the law support this contention.
 
 
 66
 Because this prosecution was based on a novel and recently enacted criminal statute, we must, at the outset, determine exactly what that statute denounces as illegal, as relevant to this case. Section 1962(c) provides:
 
 
 67
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 68
 This section must be read in the context of the statutory definitions of its key terms. "Enterprise", as used in the Act, "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity". 18 U.S.C. § 1961(4). As relevant to this case, a "pattern of racketeering activity" simply requires at least two acts of "racketeering activity" committed within ten years of each other. 18 U.S.C. § 1961(5). "Racketeering activity" includes three broad categories of crimes: (A) any of several specified "act(s) or threat(s) . . . chargeable under State law and punishable by imprisonment for more than one year", including, as relevant here, murder and arson, (B) any act which is indictable under any of several specified sections of Title 18, U.S.C., including, as relevant here, § 659 (felonious theft from interstate shipment), § 1503 (obstruction of justice), and § 2315 (interstate shipment of stolen or counterfeit securities) or (C) federal offenses involving narcotics or other dangerous drugs. 18 U.S.C. § 1961(1).
 
 
 69
 Reduced to its bare essentials, the charge against J. C. and Recea may be restated as follows:[16]
 
 
 70
 Being associated with a group of individuals who were associated in fact, J. C. and Recea Hawkins each directly and indirectly participated in the group's affairs through the commission of two or more predicate crimes.
 
 
 71
 The gist of J. C.'s and Recea's objection to their conviction on Count Two is that there was no group of individuals associated in fact no enterprise in whose affairs they could have participated, directly or indirectly. We disagree.
 
 
 72
 In United States v. Hawes, 529 F.2d 472, 479 (5th Cir. 1976), we noted that "Congress gave the term 'enterprise' a very broad meaning". On its face and in light of its legislative history, the Act clearly encompasses "not only legitimate businesses but also enterprises which are from their inception organized for illicit purposes". United States v. McLaurin, 557 F.2d 1064, 1073 (5th Cir. 1977).[17] Similarly, we are persuaded that "enterprise" includes an informal, de facto association such as that involved in this case. In defining "enterprise", Congress made clear that the statute extended beyond conventional business organizations to reach "any . . . group of individuals" whose association, however loose or informal, furnishes a vehicle for the commission of two or more predicate crimes. The statute demands only that there be association "in fact" when it cannot be implied in law. There is no distinction, for "enterprise" purposes, between a duly formed corporation that elects officers and holds annual meetings and an amoeba-like infra-structure that controls a secret criminal network.
 
 
 73
 Here, the government proved beyond a reasonable doubt the existence of an enterprise comprised of at least five of the defendants.[18] This enterprise can best be analogized to a large business conglomerate. Metaphorically speaking, J. C. Hawkins was the chairman of the board, functioning as the chief executive officer and overseeing the operations of many separate branches of the corporation. An executive committee in charge of the "Counterfeit Title, Stolen Car, and Amphetamine Sales Department" was comprised of J. C., Delph, and Taylor, who supervised the operations of lower level employees such as Farr, the printer, and Green, Boyd, and Jackson, the car thieves. Another executive committee, comprised of J. C., Recea and Foster, controlled the "Thefts From Interstate Commerce Department", arranging the purchase, concealment, and distribution of such commodities as meat, dairy products, "Career Club" shirts, and heavy construction equipment. An offshoot of this department handled subsidiary activities, such as murder and obstruction of justice, intended to facilitate the smooth operation of its primary activities. Each member of the conglomerate, with the exception of Foster, was responsible for procuring and wholesaling whatever narcotics could be obtained. The thread tying all of these departments, activities, and individuals together was the desire to make money. J. C. might have been voicing the corporation's motto when he told Bob Day, in May, 1976, "if it ain't a pretty damn good bit of money, I ain't going to fuck with it". T. 2229.
 
 
 74
 A jury is entitled to infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence. Like a criminal conspiracy, a RICO enterprise cannot be expected to maintain a high profile in the community. Its affairs are likely to be conducted in secrecy and to involve a minimal amount of necessary contact between participants. Thus, direct evidence of association may be difficult to obtain; a jury should be permitted to draw the natural inference arising from circumstantial evidence of association.[19] In this case, persuasive circumstantial evidence of association was buttressed by direct evidence tending to prove the existence of an enterprise. According to Boyd, defendant Delph stated that "he had a truck that he was running for J. C. and that they was partners in the deal or some kind of operation or setup." T. 1275-76. William Martin described defendant Taylor's admission that he and others "had just gotten through purchasing an airplane for $102,000 to bring heroin into this country", T. 1196, and J. C. told Day that he had virtually bankrupted himself by spending money on airplanes to import drugs. Leon Averett, in the course of selling a trailer load of stolen shirts, stated that his associates had a warehouse in Atlanta big enough to handle several tractor-trailers.
 
 
 75
 Additionally, although the target of the RICO statute is not "sporadic activity",[20] we find nothing in the Act excluding from its ambit an enterprise engaged in diversified activity. Indeed, Congress expressly stated that the purpose of the Act was "to seek the eradication of organized crime", which it described as a "highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct . . . ." Pub.L.91-452, § 1, 84 Stat. 922 (1970) (emphasis added). To this end, it directed that "(t)he provisions of this title shall be liberally construed to effectuate its remedial purposes". Id., § 904. While earlier cases have considered enterprises engaged in only one type of prohibited activity,[21] a single enterprise engaged in diversified activities fits comfortably within the proscriptions of the statute and the dictates of common sense:
 
 
 76
 As in a firm with a real estate department and an insurance department, the fact that partners bring in two kinds of business on the basis of their different skills and connections does not affect the fact that they are partners in a more general business venture.
 
 
 77
 United States v. Mallah, 503 F.2d 971, 976 (2d Cir. 1974), cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).[22] We would deny society the protection intended by Congress were we to hold that the Act does not reach those enterprises nefarious enough to diversify their criminal activity.[23]
 
 
 78
 The evidence in this case demonstrated the existence of an enterprise a myriopod criminal network, loosely connected but connected nonetheless. By committing arson, actively assisting a car theft ring, fencing thousands of dollars worth of goods stolen from interstate commerce, murdering a key witness, and dealing in narcotics, J. C. and Recea Hawkins directly and indirectly participated in the enterprise's affairs through a pattern, indeed a plethora, of racketeering activity. We affirm their convictions on Count Two.
 
 IV. THE RICO CONSPIRACY COUNT
 
 79
 All six defendants were convicted under 18 U.S.C. § 1962(d) of having conspired to violate a substantive RICO provision, § 1962(c). In this appeal, all defendants, with the exception of Foster, argue that while the indictment alleged but one conspiracy, the government's evidence at trial proved the existence of several conspiracies, resulting in a variance which substantially prejudiced their rights and requires reversal, citing Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Prior to the enactment of the RICO statute, this argument would have been more persuasive. However, as we explain below, RICO has displaced many of the legal precepts traditionally applied to concerted criminal activity. Its effect in this case is to free the government from the strictures of the multiple conspiracy doctrine and to allow the joint trial of many persons accused of diversified crimes.
 
 A. Prior Law: Wheels and Chains
 
 80
 1. Kotteakos and the Wheel Conspiracy Rationale : The Court in Kotteakos held that proof of multiple conspiracies under an indictment alleging a single conspiracy constituted a material variance requiring reversal where a defendant's substantial rights had been affected. At issue was "the right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others". 328 U.S. at 775, 66 S.Ct. at 1253. Kotteakos thus protects against the "spill-over effect", the transference of guilt from members of one conspiracy to members of another. United States v. Bertolotti, 529 F.2d 149, 156 (2d Cir. 1975).
 
 
 81
 The facts of Kotteakos have been summarized by this court as follows:
 
 
 82
 In that case, one where the indictment charged but one overall conspiracy, the government's proof at trial, by its own admission, showed that there were eight separate conspiracies involving some thirty-two persons. The key figure in the scheme, which involved the obtaining of government loans by making fraudulent representations, was a man named Brown, who was a part of, and directed each of the eight conspiracies. Brown was the only element common to the eight otherwise completely separate undertakings, no other person taking part in, nor having knowledge of the other conspiracies. Though each of the conspiracies had similar illegal objects, none depended upon, was aided by, or had any interest in the success of the others.
 
 
 83
 United States v. Perez, 489 F.2d 51, 60 (5th Cir. 1973). These facts led the Court to speak in terms of a "wheel conspiracy", in which one person, the "hub" of the wheel, was accused of conspiring with several others, the "spokes" of the wheel. As we explained in United States v. Levine, 546 F.2d 658, 663 (5th Cir. 1977):
 
 
 84
 For a (single) wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. Otherwise the conspiracy lacks "the rim of the wheel to enclose the spokes." If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the "wheel" is incomplete, and two conspiracies rather than one are charged. (Citations omitted).
 
 
 85
 2. Blumenthal and the Chain Conspiracy Rationale : The impact of Kotteakos was soon limited by the Court in Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), where the indictment charged a single conspiracy to sell whiskey at prices above the ceiling set by the Office of Price Administration. The owner of the whiskey, through a series of middlemen, had devised an intricate scheme to conceal the true amount he was charging for the whiskey. Although some of the middlemen had no contact with each other and did not know the identity of the owner, they had to have realized that they were indispensible cogs in the machinery through which this illegal scheme was effectuated. The Court concluded that "in every practical sense the unique facts of this case reveal a single conspiracy of which the several agreements were essential and integral steps". Id. at 559, 68 S.Ct. at 257. Thus the "chain conspiracy" rationale evolved.
 
 
 86
 The essential element of a chain conspiracy allowing persons unknown to each other and never before in contact to be jointly prosecuted as co-conspirators is interdependence. The scheme which is the object of the conspiracy must depend on the successful operation of each link in the chain. " An individual associating himself with a 'chain' conspiracy knows that it has a 'scope' and that for its success it requires an organization wider than may be disclosed by his personal participation". United States v. Agueci, 310 F.2d 817, 827 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). "Thus, in a 'chain' conspiracy prosecution, the requisite element knowledge of the existence of remote links may be inferred solely from the nature of the enterprise." United States v. Perez, supra, 489 F.2d at 59 n. 10.[24]
 
 
 87
 3. Limits of the Chain Conspiracy Rationale : The rationale of Blumenthal applies only insofar as the alleged agreement has "a common end or single unified purpose". United States v. Morado, 454 F.2d 167, 170-71 (5th Cir. 1972); United States v. Lloyd, 425 F.2d 711 (5th Cir. 1970). Generally, where the government has shown that a number of otherwise diverse activities were performed to achieve a single goal, courts have been willing to find a single conspiracy.[25] This "common objective" test has most often been used to connect the many facets of drug importation and distribution schemes.[26] The rationale falls apart, however, where the remote members of the alleged conspiracy are not truly interdependent or where the various activities sought to be tied together cannot reasonably be said to constitute a unified scheme. In United States v. Miley, 513 F.2d 1191, 1207 (2d Cir. 1975), for example, the Second Circuit held that the value and quantity of drugs sold by the defendant-suppliers was insufficient to justify the inference that each knew his supplies were only a small part of the drugs handled by a larger operation. Similarly, in United States v. Bertolotti, supra, 529 F.2d at 155, the same Court focused on an alleged narcotics conspiracy that bore little resemblance to "the orthodox business operation" found to exist in other drug cases; many of the "narcotics transactions" involved amounted to "little more than simple cash thefts" in which no drugs changed hands. The only factor that tied several isolated transactions together, the Court noted, was the presence of two of the defendants, Rossi and Coralluzzo, in each. In effect, "(t)he scope of the operation was defined only by Rossi's resourcefulness in devising new methods to make money". Under these circumstances, the Court held that the government had failed to prove the existence of a single conspiracy.
 
 
 88
 Applying pre-RICO conspiracy concepts to the facts of this case, we doubt that a single conspiracy could be demonstrated. Foster had no contact with Delph and Taylor during the life of the alleged conspiracy. Delph and Taylor, so far as the evidence revealed, had no contact with Recea Hawkins. The activities allegedly embraced by the illegal agreement in this case are simply too diverse to be tied together on the theory that participation in one activity necessarily implied awareness of others. Even viewing the "common objective" of the conspiracy as the raising of revenue through criminal activity, we could not say, for example, that Foster, when he helped to conceal stolen meat, had to know that J. C. was selling drugs to persons unknown to Foster, or that Delph and Taylor, when they furnished counterfeit titles to a car theft ring, had to know that the man supplying the titles was also stealing goods out of interstate commerce. The enterprise involved in this case probably could not have been successfully prosecuted as a single conspiracy under the general federal conspiracy statute, 18 U.S.C. § 371.[27]
 
 
 89
 B. RICO to the Rescue: The Enterprise Conspiracy
 
 
 90
 In enacting RICO, Congress found that "organized crime continues to grow" in part "because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact". Thus, one of the express purposes of the Act was "to seek the eradication of organized crime . . . by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime". Pub.L.91-452, § 1, 84 Stat. 922 (1970). Against this background, we are convinced that, through RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate "wheel" and "chain" rationales with a new statutory concept: the enterprise.
 
 
 91
 To achieve this result, Congress acted against the backdrop of hornbook conspiracy law. Under the general federal conspiracy statute,
 
 
 92
 the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942).
 
 
 93
 In the context of organized crime, this principle inhibited mass prosecutions because a single agreement or "common objective" cannot be inferred from the commission of highly diverse crimes by apparently unrelated individuals. RICO helps to eliminate this problem by creating a substantive offense which ties together these diverse parties and crimes. Thus, the object of a RICO conspiracy is to violate a substantive RICO provision here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity. The gravamen of the conspiracy charge in this case is not that each defendant agreed to commit arson, to steal goods from interstate commerce, to obstruct justice, and to sell narcotics; rather, it is that each agreed to participate, directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes. Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs.[28] To find a single conspiracy, we still must look for agreement on an overall objective. What Congress did was to define that objective through the substantive provisions of the Act.
 
 C. Constitutional Considerations
 
 94
 The "enterprise conspiracy" is a legislative innovation in the realm of individual liability for group crime. We need to consider whether this innovation comports with the fundamental demand of due process that guilt remain "individual and personal". Kotteakos, supra, 328 U.S. at 772, 66 S.Ct. at 1252.
 
 
 95
 The substantive proscriptions of the RICO statute apply to insiders and outsiders those merely "associated with" an enterprise who participate directly and indirectly in the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). Cf. United States v. Forsythe, 560 F.2d 1127, 1135-36 (3d Cir. 1977). Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise. This effect is enhanced by principles of conspiracy law also developed to facilitate prosecution of conspirators at all levels. Direct evidence of agreement is unnecessary: "proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence ordinarily the acts and conduct of the alleged conspirators themselves". United States v. Morado, supra, 454 F.2d at 174. Additionally, once the conspiracy has been established, the government need show only "slight evidence" that a particular person was a member of the conspiracy. Id. at 175. Of course, "a party to a conspiracy need not know the identity, or even the number, of his confederates". United States v. Andolschek, 142 F.2d 503, 507 (2d Cir. 1944).
 
 
 96
 Undeniably, then, under the RICO conspiracy provision, remote associates of an enterprise may be convicted as conspirators on the basis of purely circumstantial evidence. We cannot say, however, that this section of the statute demands inferences that cannot reasonably be drawn from circumstantial evidence or that it otherwise offends the rule that guilt be individual and personal. The Act does not authorize that individuals "be tried en masse for the conglomeration of distinct and separate offenses committed by others". Kotteakos, supra. Nor does it punish mere association with conspirators or knowledge of illegal activity; its proscriptions are directed against conduct, not status. United States v. Forsythe, supra, 560 F.2d at 1136. To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes. One whose agreement with the members of an enterprise did not include this vital element cannot be convicted under the Act. Where, as here, the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable.
 
 
 97
 It is well established that "(t)he government is not required to prove that a conspirator had full knowledge of all the details of the conspiracy; knowledge of the essential nature of the plan is sufficient". United States v. Brasseaux, 509 F.2d 157, 160 n. 3 (5th Cir. 1975). The Supreme Court explained the policy behind this rule in Blumenthal v. United States, supra, 332 U.S. at 556-57, 68 S.Ct. at 256:
 
 
 98
 For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity. (citation omitted)
 
 
 99
 In the instant case, it is clear that "the essential nature of the plan" was to associate for the purpose of making money from repeated criminal activity. Defendant Foster, for example, hired J. C. Hawkins to commit arson, helped him to conceal large quantities of meat and shirts stolen from interstate commerce, and bought a stolen forklift from him. It would be "a perversion of natural thought and of natural language"[29] to deny that these facts give rise to the inference that Foster knew he was directly involved in an enterprise whose purpose was to profit from crime. As we noted in United States v. Gonzalez, 491 F.2d 1202, 1206 (5th Cir. 1974), "persons so associating and forming organizations for furthering such illicit purposes do not normally conceive of the association as engaging in one unlawful transaction and then disbanding. Rather the nature of such organizations seems to be an ongoing operation . . . " Foster also had to know that the enterprise was bigger than his role in it, and that others unknown to him were participating in its affairs. He may have been unaware that others who had agreed to participate in the enterprise's affairs did so by selling drugs and murdering a key witness. That, however, is irrelevant to his own liability, for he is charged with agreeing to participate in the enterprise through his own crimes, not with agreeing to commit each of the crimes through which the overall affairs of the enterprise were conducted.[30] We perceive in this no significant extension of a co-conspirator's liability. When a person "embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them". United States v. Andolschek, supra, 142 F.2d at 507.[31]
 
 
 100
 Our society disdains mass prosecutions because we abhor the totalitarian doctrine of mass guilt. We nevertheless punish conspiracy as a distinct offense because we recognize that collective action toward an illegal end involves a greater risk to society than individual action toward the same end.[32] That risk is greatly compounded when the conspirators contemplate not a single crime but a career of crime. "There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all . . . . When many conspire, they invite mass trial by their conduct". Kotteakos, supra, 328 U.S. at 773, 66 S.Ct. at 1252.
 
 
 101
 We do not lightly dismiss the fact that under this statute four defendants who did not commit murder have been forced to stand trial jointly with, and as confederates of, two others who did. Prejudice inheres in such a trial; great Neptune's ocean could not purge its taint.[33] But the Constitution does not guarantee a trial free from the prejudice that inevitably accompanies any charge of heinous group crime; it demands only that the potential for transference of guilt be minimized to the extent possible under the circumstances in order "to individualize each defendant in his relation to the mass". Kotteakos, supra, 328 U.S. at 773, 66 S.Ct. at 1252. The RICO statute does not offend this principle. Congress, in a proper exercise of its legislative power, has decided that murder, like thefts from interstate commerce and the counterfeiting of securities, qualifies as racketeering activity. This, of course, ups the ante for RICO violators who personally would not contemplate taking a human life. Whether there is a moral imbalance in the equation of thieves and counterfeiters with murderers is a question whose answer lies in the halls of Congress, not in the judicial conscience.
 
 
 102
 D. Other Issues Related to the Conspiracy Count
 
 
 103
 1. The Court's Charge: All defendants, with the exception of Foster, allege that the trial court committed reversible error in failing to instruct the jury on the consequences of finding multiple conspiracies and in improperly charging that "you must find" a single conspiracy. Objections to the court's charge were timely made. T. 2738, 2745. We hold that these assignments of error are without merit.
 
 
 104
 Some cases have held that an instruction informing the jury that it could find the defendants guilty on the basis of multiple conspiracies helps to minimize the danger of transferring guilt. See, e. g., United States v. Varelli, 407 F.2d 735 (7th Cir. 1969). Such an instruction is necessary only when the indictment charges a single conspiracy and, at trial, "the possibility of a variance appears". Id. at 746. Here, there was no variance. The court had no duty to instruct on multiple conspiracies.
 
 
 105
 As appellants point out, the trial court gave the following instruction on the single conspiracy question:
 
 
 106
 Now I point out to you that this indictment alleges but one conspiracy. You can find only the existence of one conspiracy, and you must find that the defendants were each a member of the same conspiracy. We are talking about one conspiracy. T. 2728-29.
 
 
 107
 Read out of context, this passage seems to instruct the jury that it must find, as a matter of law, that each defendant was a member of a single conspiracy. "It is elementary, however, that the correctness of a charge is measured not by an isolated remark but by the charge as a whole". United States v. Rouse, 452 F.2d 311, 314 (5th Cir. 1971). Reading the charge in this case as a whole, it is clear that the trial judge did not usurp the jury's function. At several points throughout the charge, the judge used language to the effect, "in order to find the defendants guilty, you must find . . . ." Often, however, the judge omitted those prefatory words and stated simply, "you must find . . .. " The contested conspiracy instruction came at the end of the court's charge, shortly after the judge, in summation, stated, "So it is that there are four essential elements that you must find". Then, eight times in three paragraphs, the judge instructed the jury as to what it "must find". The charge was not a model of precision. Nevertheless, we are satisfied that the jury understood the words "you must find" in the context intended by the trial judge and made apparent by the charge in its entirety.
 
 2. Sufficiency of the Evidence:
 
 108
 ( a) As to William Foster : Although the only issue raised by defendant Foster is the sufficiency of the evidence against him, we find this contention to be without merit and undeserving of protracted discussion. As we read Foster's brief, his arguments address the credibility, not the sufficiency of the evidence. Decisions regarding credibility are for the jury and are not to be made by an appellate court. United States v. Grimm, 568 F.2d 1136, 1138 (5th Cir. 1978); Walker v. United States, 301 F.2d 94 (5th Cir. 1972).
 
 
 109
 (b) As to James Elliott : The evidence relevant to James Elliott as we view the record, was not sufficient to permit the jury to conclude that he conspired with the other five defendants to violate the RICO statute. Accordingly, his conviction under Count One must be reversed.
 
 
 110
 We recognize "that once a conspiracy is shown to exist, slight evidence is all that is required to connect a particular defendant with the conspiracy". United States v. Prince, 515 F.2d 564, 567 (5th Cir. 1975); United States v. Reynolds, 511 F.2d 603, 607 (5th Cir. 1975).
 
 
 111
 The proof, however, must be individual and personal and the government must prove beyond a reasonable doubt that each member of the conspiracy had the deliberate, knowing, and specific intent to join the conspiracy. Mere association with conspirators or knowledge of the illegal activity is not sufficient. United States v. Falcone, 1940, 311 U.S. 205, 210-11, 61 S.Ct. 204, 85 L.Ed. 128; United States v. Miller, 5 Cir., 1974, 500 F.2d 751, 764; United States v. Morado, 5 Cir., 1972, 454 F.2d 167, 175; Roberts v. United States, 5 Cir., 1969, 416 F.2d 1216, 1220; Causey v. United States, 5 Cir., 1965, 352 F.2d 203, 206.
 
 
 112
 Prince, supra, 515 F.2d at 567.
 
 
 113
 Where the government, as here, relies mainly upon circumstantial evidence to establish a defendant's guilt, we test the sufficiency of the evidence by asking whether the jury might reasonably have concluded that the evidence fails to exclude every reasonable hypothesis but that of guilt. Roberts v. United States, 416 F.2d 1216, 1220 (5th Cir. 1969). Cf. United States v. White, 569 F.2d 263 (5th Cir. 1978) for alternate statements of the test.
 
 
 114
 Viewed in a light most favorable to the government, the evidence against Elliott proved the following:(1) Early in the spring of 1971, Joe Fuchs gave Elliott a bottle of 500 amphetamine capsules without a prescription.
 
 
 115
 (2) Shortly thereafter, Elliott negotiated a deal with Fuchs for Joe Breland to build an enclosed porch and for Fuchs to repay Elliott and Breland with amphetamine pills. During the next year, Fuchs delivered the pills in installments of 400.
 
 
 116
 (3) In April, 1972, Elliott, apparently as a favor for J. C., either sold or gave to Fuchs a 50 pound piece of stolen Hormel meat.
 
 
 117
 (4) In May, 1973, Elliott, serving as a juror in the trial of Rudolph Flanders for possession of meat from the same stolen shipment, held out for acquittal, causing a mistrial. No evidence was presented that Elliott had been contacted in advance about how he would vote in the Flanders case, although J. C. had told others that he felt Elliott would cooperate.
 
 
 118
 (5) In January, 1976, Elliott encouraged Fuchs to lie to a federal grand jury about how he acquired the stolen meat given to him by Elliott in 1972.
 
 
 119
 This evidence could not be taken to support, to the exclusion of all other reasonable hypotheses, a conclusion by the jury that Elliott agreed to participate, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity. At best, this evidence discloses that Elliott used a close friend, Joe Fuchs, as a personal source of amphetamines and that he became peripherally involved in a stolen meat deal, an involvement he later attempted to conceal. The government failed to prove that Elliott's amphetamine transactions with Fuchs were in any way connected with the affairs of the enterprise. The Hormel meat, on the other hand, undeniably was acquired as a result of enterprise activity, but Elliott's cooperation with J. C. Hawkins in disposing of a small portion of the meat is insufficient to prove beyond a reasonable doubt that Elliott knowingly and intentionally joined the broad conspiracy to violate RICO. Elliott's acts are equally consistent with the hypothesis that he conspired with J. C. and Fuchs for the limited purpose of aiding in the distribution of stolen meat, an offense with which he was not charged in this case. Under this hypothesis, Elliott agreed to participate in the affairs of the enterprise, but not through a pattern of racketeering activity, hence, not in violation of the Act. Similarly, Elliott's two subsequent attempts to cover up the facts in the Hormel meat case are subject to two interpretations: (1) as possible overt acts in furtherance of an agreement to participate in the enterprise's affairs through a pattern of racketeering activity, or (2) as efforts at concealment undertaken after the object of his more limited conspiracy with J. C. and Fuchs had been accomplished, on the theory that "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces". Grunewald v. United States, 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). To allow these predictable acts of concealment to be construed as independent evidence that Elliott agreed to conduct a pattern of racketeering activity would unjustifiably broaden the already pervasive scope of the RICO statute. We hold, then, that the more reasonable conclusion dictated by these facts is that, while Elliott may have conspired to distribute stolen meat, the jury could not reasonably conclude that he conspired to violate RICO.
 
 
 120
 As in Roberts v. United States, supra, we hold that the inference of Elliott's guilt was not a reasonable one for the jury to entertain and that "(r)easonable hypotheses of innocence were not excluded". United States v. Black, 497 F.2d 1039, 1041 (5th Cir. 1974). We are convinced that Elliott "associated with the wrong people and was convicted because of guilt by association only". Roberts, supra, 416 F.2d at 1221. We thus reverse his conviction under Count One.
 
 V. THE SECURITIES ISSUE
 
 121
 J. C. Hawkins' involvement with counterfeit Georgia State Certificates of Title furnished the basis for his conviction on Count Eight of receiving and disposing of a counterfeit security moving in interstate commerce, in violation of 18 U.S.C. § 2315. Also, because conduct violative of § 2315 qualifies as an act of racketeering activity under 18 U.S.C. § 1961(1)(B), evidence that J. C., Delph, and Taylor distributed the counterfeit titles was admitted during the trial as relevant to the RICO conspiracy charge, Count One. At trial and in this appeal, J. C., Delph, and Taylor contend that evidence relating to the titles was improperly admitted because a Georgia State Certificate of Title is not a "security" as that term is defined in 18 U.S.C. § 2311. We cannot agree.
 
 
 122
 A security, for § 2315 purposes, includes, in part, any "instrument or document or writing evidencing ownership of goods, wares, and merchandise or transferring or assigning any right, title or interest in or to goods, wares, and merchandise". 18 U.S.C. § 2311. Under Georgia law, a certificate of title is prima facie evidence of ownership of an automobile and is sufficient to prove ownership in the absence of evidence clearly contradicting the facts recited in the certificate. Hightower v. Berlin, 129 Ga.App. 246, 199 S.E.2d 335 (1973); Baker v. State, 123 Ga.App. 394, 181 S.E.2d 288 (1971); Ga.Code Ann. § 68-411a(c) (1975). Accordingly, we hold that a Georgia State Certificate of Title is a "security", as defined in 18 U.S.C. § 2311. Cf. United States v. Dickson, 462 F.2d 184 (4th Cir. 1972), cert. denied, 409 U.S. 876, 93 S.Ct. 126, 34 L.Ed.2d 129. Although appellants cite United States v. Canton, 470 F.2d 861 (2d Cir. 1972), as authority to the contrary, we note that Canton involved a counterfeit New York State certificate of registration "the purpose of which is to show that the motor vehicle may rightfully be operated on public highways", and which "was never intended . . . as a certificate of title". Canton is thus inapposite to the facts of this case.
 
 VI. PROCEDURAL ISSUES
 
 123
 A. Restrictions on the Scope of Cross-Examination
 
 
 124
 J. C. and Recea Hawkins contend that their Sixth Amendment right to confront witnesses was denied by the trial court's restrictions on the scope of cross-examination. In general, these restrictions concerned defense efforts to impeach the government's witnesses by exposing details of the agreements under which they testified.
 
 
 125
 As we said in United States v. Onori, 535 F.2d 938, 945 (5th Cir. 1976):
 
 
 126
 The Sixth Amendment confrontation clause guarantees to a criminal defendant the right to cross-examine a witness against him. See Pointer v. Texas, 380 U.S. 400, 404-05, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This right is especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government. See, e. g., United States v. Greenberg, 423 F.2d 1106 (5th Cir. 1970); Grant v. United States, 368 F.2d 658, 661 (5th Cir. 1966). Indeed, it is so important that the defendant is allowed to "search" for a deal between the government and the witness, even if there is no hard evidence that such a deal exists. See Grant v. United States, supra. What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists. United States v. Dickens, 417 F.2d 958, 959 (8th Cir. 1969).
 
 
 127
 The first question we must address is whether the restrictions on cross-examination violated the defendants' Sixth Amendment rights, requiring scrutiny under the harmless error rule, or whether they were at worst abuses of discretion without constitutional dimension. We have long recognized that "while the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment". United States v. Bass, 490 F.2d 846, 858 n. 12 (5th Cir. 1974). See also United States v. Mayer, 556 F.2d 245, 250 (5th Cir. 1977); Grant v. United States, 368 F.2d 658, 661 (5th Cir. 1966). Unless a ruling by the trial judge has completely foreclosed a line of questioning allowable as a matter of right, see, e. g., United States v. Greenburg, 423 F.2d 1106 (5th Cir. 1970); Grant v. United States, supra, it is often difficult to determine how much cross-examination is "sufficient . . . to satisfy the Sixth Amendment". In Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court suggested a pragmatic approach to the problem:
 
 
 128
 While counsel was permitted to ask Green whether he was biased, counsel was unable to make a record from which to argue why Green might have been biased . . . (T)o make such an inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right to effective cross-examination. Id. at 318, 94 S.Ct. at 1111 (emphasis in original).
 
 
 129
 In this case, the jury was well aware of the fact that most of the government's witnesses were co-conspirators and convicted felons, testifying under grants of immunity and other agreements with the prosecution. In no sense did the trial court foreclose cross-examination on this issue. We gather, from the generalized complaints lodged by J. C. and Recea in this appeal, that, on occasion, the court prevented further inquiry into certain details of the agreements between the government and its witnesses. Nevertheless, the jury was exposed to facts sufficient for it to "draw inferences relating to the reliability" of the witnesses, and counsel for J. C. Hawkins, in his closing argument, used facts developed on cross-examination "to argue why (the witnesses) might have been biased." Davis v. Alaska, supra. In fact, counsel's argument could hardly have been more vociferous:
 
 
 130
 But what do we have as the witnesses who are trying to put it on Mr. Hawkins? You know what we have? We've got every person who's been caught doing this or that for the past six years, and what are they doing they're fighting for their lives up there . . . (T)hese persons were given an offer they could not refuse. They were given immunity; they were made promises; they had charges dismissed; they had letters written to probation officers; letters of recommendations to institutions. They couldn't turn those down and they gobbled them up, and they came here to spew out their guts against J. C. Hawkins. . . . And this room smelled, this United States courtroom, which is the symbol of justice in our society, stunk from the lies of the Government's witnesses. T. 2645-47.[34]
 
 
 131
 In these circumstances, we hold that the restrictions on cross-examination did not rise to the level of a violation of J. C.'s or Recea's Sixth Amendment rights.
 
 
 132
 The only remaining question is whether the trial judge abused his discretion in restricting the scope of cross-examination. "To establish an abuse of discretion appellants must show that the restrictions imposed upon their cross-examination were clearly prejudicial". Gordon v. United States,438 F.2d 858, 865 (5th Cir. 1971). Here, J. C. and Recea cite only two restrictions of any moment: (1) disallowing questions to determine whether the government had provided James Gunnells "with a permit for a machine gun that ordinarily would not be permitted to . . . other people in the courtroom", and (2) forcing counsel for Robert Delph to inform the jury that she had no independent proof of a deal between state and federal authorities relating to a witness against Delph. Although it is apparent that the trial judge based these restrictions on erroneous legal principles, we cannot say that they were " clearly prejudicial" to any defendant.[35] We do not wish to minimize the importance of cross-examination in criminal trials. However, after reviewing the voluminous record in this case, we are convinced that the few improper restrictions on cross-examination that were made were of too trifling a nature to warrant reversal of any defendant's conviction.
 
 
 133
 B. Denial of Motions for a Bill of Particulars
 
 
 134
 Delph and Taylor argue that evidence of their drug transactions should not have been admitted at trial because these acts were not mentioned in the indictment and the trial judge denied all motions for a bill of particulars. We find no merit to this contention.
 
 
 135
 Delph's and Taylor's drug transactions were proved as overt acts in furtherance of the RICO conspiracy charged in Count One. The 25 overt acts listed in the indictment did not include any drug transactions involving either Delph or Taylor. However, Count One did identify Delph and Taylor as members of the conspiracy and charged, in part, that "(i)t was a . . . part of the conspiracy that defendants illegally trafficked in narcotics and other dangerous drugs". We have long followed the rule that the government is not limited to overt acts pleaded in the indictment in proving a conspiracy; it may show other acts of the conspirators occurring during the life of the conspiracy. United States v. Perez, supra, 489 F.2d at 70; United States v. Ayres, 434 F.2d 60, 62 (5th Cir. 1970), cert. denied, 401 U.S. 938, 91 S.Ct. 930, 28 L.Ed.2d 217 (1971). This rule works no injustice in this case because the indictment put each defendant on notice that overt acts of narcotics trafficking might be proved at trial.
 
 
 136
 We are not unmindful of counsel's argument that notice and pleading requirements developed in the context of the general federal conspiracy statute may not pass constitutional muster under the RICO conspiracy statute. We do not reach this question, however, because we are satisfied that the indictment in this case afforded adequate notice under any reasonable test.
 
 VII. CONCLUSION
 
 137
 Through RICO, Congress defined a new separate crime to help snare those who make careers of crime. Participation in the affairs of an enterprise through the commission of two or more predicate crimes is now an offense separate and distinct from those predicate crimes. So too is conspiracy to commit this new offense a crime separate and distinct from conspiracy to commit the predicate crimes. The necessity which mothered this statutory invention was caused by the inability of the traditional criminal law to punish and deter organized crime.
 
 
 138
 The realistic view of group crime which inspired Congress to enact RICO should also guide the courts in construing RICO. Thus, in this case, we are satisfied that the evidence, circumstantial and indirect though it largely was, proved the existence of both an enterprise committed to profiting from criminal activity and an agreement among five of the defendants to participate in the affairs of the enterprise through a pattern of racketeering activity.
 
 
 139
 As explained above, we find the evidence insufficient to sustain James Elliott's conviction on Count One and reverse as to him. We find that the other defendants were properly convicted and affirm in each of their cases. Those five, Delph, Foster, Recea Hawkins, John Clayburn Hawkins, Jr. a/k/a J. C., and Taylor received their just desserts by the verdict of the jury in a fair trial free from prejudicial error.
 
 
 140
 AFFIRMED IN PART; REVERSED IN PART.
 
 
 
 [1]
 Foster denied having ordered the night watchman fired and attempted to prove that McMullen himself was employed as a night watchman, an allegation which McMullen denied. We assume that the jury chose not to believe Foster's account
 
 
 [2]
 Green testified that Taylor specifically named J. C. but that Delph identified his source only as someone in Macon
 
 
 [3]
 The government notes in its brief that Robert Delph was present at the service station when Moseley observed the trailer there shortly before its theft on April 1 and that five or six months earlier Delph had been employed to drive that same tractor. Since the government proved Delph's involvement in more than enough criminal acts to satisfy the requirements for a RICO conspiracy, we need not decide whether this evidence is sufficient to prove Delph's involvement in the trailer theft
 Similarly, the government cites testimony from Kenneth Boyd, a member of the car theft ring, to implicate Delph and Taylor in the scheme to distribute the stolen Hormel meat. Boyd testified that in "the spring of 1972" Delph offered to sell him a "truckload of meat" which he described as "swinging beef", T. 1252-53, and that around the same time, Taylor offered to sell him "some meat". T. 1262-63. For the reason stated above, we need not decide whether this evidence is sufficient to prove that Delph and Taylor attempted to sell the stolen Hormel meat. We note, however, that the Hormel meat was not "swinging beef" and that a shipment of meat of that description was not stolen until the following year.
 
 
 [4]
 Elliott, testifying in his own defense, denied this transaction with Fuchs. A tape of a conversation between Elliott and Fuchs on January 30, 1976, recorded by the FBI with Fuchs' consent and admitted into evidence at the trial, supports Fuchs' account. During the conversation, which took place two days after Fuchs testified before a federal grand jury, Elliott expressed concern that the government would use Fuchs to implicate him in the Hormel meat episode. (We note that both men mistakenly believed that the meat they were discussing was Swift meat.)
 ELLIOTT: I don't want you to fuck me up, but I don't know of but one thing you could fuck me up on . . . They'll try to make you say you got it from J. C. But, if you remember, I didn't bring it over there; you come got it. So there ain't no way in hell they can tie me in with it. Then you brought it back. Said you couldn't
 FUCHS: Well, the meat inspector came down where I was getting it cut up and said it was not too kosher and he either called Woo or called me and told me he wasn't going to cut it, and I said I'll pick it up.
 ELLIOTT: And you brought it back.
 FUCHS: And I brought it back.
 ELLIOTT: See, I didn't bring it to you, so there's no way in hell they can tie me into it. T. 2108.
 But still you didn't get it from me. I believe you got it at my house, but I don't have a damn freezer. T. 2110.
 Additionally, the tape corroborates Fuchs' testimony that Elliott sought to persuade Fuchs to tell the grand jury that he had been given the meat by a former Swift employee, Jimmy Fincher, who was deceased at the time of the grand jury's investigation. In his conversation with Fuchs on January 30, 1976, Elliott made the following statements:
 "Just like if you just like this, if the man they blamed it on is gone. He's dead. There's no crime in that if he's dead. He can't testify". T. 2107.
 "But there's no way in hell they could prove otherwise that Jimmy Fincher sold you that meat, no way in hell". T. 2108.
 "I damn sure wouldn't tell them I got it over there. I'd tell them I got it from Leon Fincher". T. 2110.
 Although Elliott was acquitted on Count Seven, corruptly endeavoring to obstruct justice by encouraging Fuchs to lie to the grand jury, in violation of 18 U.S.C. § 1503, he was convicted on Count One, the RICO conspiracy count, which included Elliott's encouragement of Fuchs as an overt act in furtherance of the conspiracy. As we explain in note 5, infra, the jury was entitled to conclude that an act not criminal in itself was committed in furtherance of a conspiracy.
 
 
 [5]
 This episode is mentioned twice in the indictment in this case, first as an overt act in the broad conspiracy charge in Count One, and again as the basis of the substantive charge of obstructing justice, in violation of 18 U.S.C. §§ 1503 and 2, Count Four. J. C. Hawkins and Elliott were named in both counts. Both were found guilty under Count One but were acquitted under Count Four, Hawkins by jury verdict, Elliott by directed verdict. Elliott now argues that his acquittal on the substantive offense precludes consideration of that offense as part of the conspiracy charge, citing United States v. Campanale, 518 F.2d 352, 358 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). Dicta in Campanale that acquittal on substantive offenses "presumably eliminate(s) those acts from consideration under the (RICO) conspiracy count" does not comport with prior case law in this and other circuits. "An acquittal on a substantive offense does not preclude a verdict of guilty on a count charging a conspiracy to commit such substantive offense". United States v. Carlton, 475 F.2d 104, 106 (5th Cir. 1973), cert. denied, 414 U.S. 842, 94 S.Ct. 100, 38 L.Ed.2d 80. This principle applies with equal force where, as here, the alleged conspiracy had as its purpose far more than the commission of the single substantive offense of which a defendant was acquitted. "The overt act . . . need not be a crime and is not a part of the offense charged, but simply something done in furtherance of the object of the conspiracy . . . ." Castro v. United States, 296 F.2d 540, 542-43 (5th Cir. 1961). Here, we are bound by the determination that J. C. and Elliott did not commit the crime of obstructing justice in violation of 18 U.S.C. § 1503. Nevertheless, we may infer that the jury, in finding J. C. and Elliott guilty on Count One, concluded that both engaged in acts "done in furtherance of the object of the conspiracy" but not criminal in themselves that J. C. promised to contact Elliott in an effort to hang the Flanders jury, and that Elliott voted to acquit Flanders. We recognize that Elliott's vote to acquit is not unambiguously an act in furtherance of the conspiracy and might, as Elliott testified, have been based on a genuine conviction that the government had not proved Flanders guilty beyond a reasonable doubt. Interpretation of Elliott's acts was within the province of the jury and we assume with all due "judicial skepticism", United States v. Caro, 569 F.2d 411, 417 (5th Cir. 1978) that the jury chose not to believe Elliott's account
 
 
 [6]
 Although not essential to the government's case, the jury could have inferred that Foster borrowed this money to pay for the stolen meat and dairy products. The loan was made to Foster through two checks from Gunnells, one for $4,500 dated October 22, 1973, the other for $4,000, dated October 23, both payable to Community Projects, Foster's corporation, and endorsed by Foster. According to Gunnells, Foster explained that he needed the money for an apartment project under construction by one of his corporations. Foster denied that the checks represented a loan to him and testified that he had cashed them as a favor to Gunnells and had turned the cash over to Gunnells. T. 2448. The jury apparently chose not to believe Foster's account
 
 
 [7]
 Averett, in prison in Texas when the RICO trial began, was brought to Macon under a writ of habeas corpus ad testificandum but, for reasons not reflected in the record, was never put on the stand by the government. His involvement with J. C. in this and a later fencing operation involving stolen shirts, described below, was established solely through the testimony of Paul Moose, Jr. Other evidence at the trial indicated an association between J. C. and Averett. In February, 1976, J. C. discussed his potential criminal liability with Joe Fuchs. The conversation was surreptitiously recorded, with Fuchs' consent, and included the following exchanges:
 FUCHS: The only thing I know is well, that time we picked up the meat with Avery (sic). That was down there on Mulberry.
 HAWKINS: They've got records of that. Me and you and him, you know. T. 2117.
 FUCHS: I know we went (to the nursing homes) one time because Leon was with us
 HAWKINS: What's the name of that place it's on Mulberry Street.
 FUCHS: It's on Mulberry Street and Leon was with us. He wanted to fly but I thought we had too much stuff in the plane, too much meat to carry it. That's the only time I can remember.
 HAWKINS: That's the only time I've been around you
 FUCHS: And we either carried that to LaGrange or Lumber City.
 HAWKINS: I think it was LaGrange. T. 2119.
 In May, 1976, in a surreptitiously recorded conversation with his friend, Bob Day, J. C. stated: "I've got to go to Texas to see a boy out there in prison. We got a letter from him Thursday," T. 2235, and, later, "I need to go over there this month to see Leon in Texas, Texarkana", T. 2238.
 
 
 [8]
 Foster denied that he knew the forklift was stolen, explaining that Gunnells told him that he rented it from the "Jones Equipment Company" in Atlanta. For the entire time he possessed the forklift, however, Foster admitted that he signed no lease and paid no rent. In fact, he testified that "Mr. Jones" visited him once and called him on several occasions to complain angrily that he had received no rent; Foster told "Mr. Jones" that he would make no payments until he was reimbursed for repairs he had to make on the forklift. Foster insisted that he tried to contact "Mr. Jones", but that he could find no listing for a "Jones Equipment Company" in Atlanta, and a letter that he mailed to "Mr. Jones" at an address furnished by Gunnells was returned unopened and stamped, "Addressee Unknown". Although Foster described "Mr. Jones" "as a pretty hefty fellow", T. 2499, he must have seemed pretty thin to the jury
 
 
 [9]
 Foster, who denied any involvement with the stolen shirts, specifically denied that he gave Gunnells any shirts for Christmas in 1973. That year, he recalled, his Christmas present to Gunnells was a ham. T. 2458
 
 
 [10]
 While we must assume that the jury credited Fuchs' testimony, Elliott denied any involvement with the work done on Fuchs' porch and swore that he never received any "black Beauties" on this or on an earlier occasion described by Fuchs. Around the time that Breland began the work on the porch, Elliott recalled that Fuchs gave him an envelope stapled shut and asked that he deliver it to Joe Breland; he did not know the contents of the envelope. Breland, who admitted receiving pills from Fuchs in exchange for the work, testified that Elliott was not involved in negotiating the porch deal and that the work on Fuchs' porch took no more than two days to complete
 
 
 [11]
 We recently reversed Herring's conviction on several federal drug charges on grounds of prejudicial publicity at a crucial point in the trial. United States v. Herring, 568 F.2d 1099 (5th Cir. 1978) (1978). Herring was at one time road manager for the popular rock musician Gregg Allman. The principal witnesses against Herring were Allman and Joe Fuchs, who pleaded guilty as a co-conspirator in Herring's case and who was listed as an unindicted co-conspirator in the instant case
 
 
 [12]
 In the same raid, several of the stolen "Career Club" shirts were also seized. Strozier and Thomas denied that the shirts were theirs, thus permitting the jury to infer that they belonged to Recea
 
 
 [13]
 Evidently, J. C. was unfamiliar with a line of cases in this Circuit holding that "the uncorroborated testimony of an accomplice is sufficient to support a conviction in the federal courts if it is not on its face incredible or otherwise insubstantial". United States v. Iacovetti, 466 F.2d 1147, 1153 (5th Cir. 1972), cert. denied, 410 U.S. 908, 93 S.Ct. 963, 35 L.Ed.2d 270
 
 
 [14]
 J. C.'s lecture to Joe Fuchs about the "one on one" principle is worth recording for the insight it provides into the rationale apparently behind most of the enterprise's activities:
 HAWKINS: That's one against one and which one wins? If they don't have the meat so what's the deal? You're as good as he is or better. He said you did, you say you didn't. Who's going to believe what? You'll never be indicted on that shit. I been down them roads twenty-five years. It don't bother me if a guy said well, J. C. sold me or stole or sold or I saw or shit that's unreal. If they catch me in the act or catch me with the goods or two or three guys tell them they bought it or seen it or I had it, then that's a different story. That's the story that will go down in the book, in the court and it'll convict your ass. T. 2123.
 
 
 [15]
 The defendants were not charged under the general conspiracy statute, 18 U.S.C. § 371, which carries a maximum penalty less severe than does the specific RICO conspiracy provision
 
 
 [16]
 To keep our restatement of the charge as simple as possible, we have omitted the interstate commerce element necessary to make out a RICO violation. With multiple thefts from interstate commerce, transportation of stolen cars and counterfeit titles across numerous state lines, and sales of stolen goods in several states, there is no question that this case involves an effect on interstate commerce more than adequate to satisfy RICO requirements
 
 
 [17]
 The dispute over whether the Act reaches illegitimate businesses stems from dicta in Ianelli v. United States, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). Although that case did not involve a prosecution under the RICO statute, the Court, in footnote 19, noted: "(RICO) seeks to prevent the infiltration of legitimate business operations affecting interstate commerce by individuals who have obtained investment capital from a pattern of racketeering activity". As we explained in United States v. McLaurin, supra, 557 F.2d at 1073, there is no indication that this dicta was intended to describe fully the ambit of the Act's coverage. Furthermore, the Act on its face draws no distinction between legitimate and illegitimate businesses, and the legislative history supports the broad application inherent in the words of the statute. See "Congressional Statement of Findings and Purpose", Pub.L.No.91-452, § 1, 84 Stat. 922 (1970); United States v. Brown, 555 F.2d 407, 415-16 (5th Cir. 1977). "(W)e do not believe that it is normally a proper judicial function to try to cabin in the plain language of a statute, even a criminal statute, by limiting its coverage to the primary activity Congress had in mind when it acted". United States v. Mandel, 415 F.Supp. 997, 1019 (D.Md.1976), quoting United States v. LeFaivre, 507 F.2d 1288, 1295 (4th Cir. 1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975)
 
 
 [18]
 As we explain below, we hold that the evidence was insufficient to tie James Elliott to the enterprise or to a conspiracy to violate the Act. The number of persons making up an enterprise is irrelevant, however, in that even a single individual may be considered an "enterprise" under the statutory definition. 18 U.S.C. § 1961(4). Thus, under the facts of this case, we could view J. C. Hawkins as the enterprise and the other defendants as persons merely "employed by or associated with" the enterprise. 18 U.S.C. § 1962(c). We treat the enterprise in this case as a group of people in light of the government's admission that its "theory of the case from beginning to end has been that the 'enterprise' in this case was comprised of all six appellants as a group of individuals associated in fact". Brief of Appellee at 10. The indictment charged only that each defendant was associated with the enterprise
 
 
 [19]
 In conspiracy cases, we allow the jury to infer agreement on the basis of "the acts and conduct of the alleged conspirators themselves". United States v. Morado, 454 F.2d 167, 174 (5th Cir. 1972). In this case, it is apparent that the enterprise operated in a manner calculated to minimize direct evidence of association. See notes 13 and 14, supra, and accompanying text
 
 
 [20]
 S.Rep.91-617, 91st Cong., 1st Sess. at 158 (1969)
 
 
 [21]
 See, e. g., United States v. McLaurin, 557 F.2d 1064 (5th Cir. 1977) (prostitution ring); United States v. Brown, 555 F.2d 407 (5th Cir. 1977) (solicitation and acceptance of bribes by members of police department); United States v. Morris, 532 F.2d 436 (5th Cir. 1976) (series of rigged card games)
 
 
 [22]
 Although Mallah was a conspiracy, not a RICO, case, we believe that the business venture analogy is appropriate to help define a RICO "enterprise". See also United States v. Palermo, 410 F.2d 468 (7th Cir. 1969), in which the Court found "one overall agreement to extort money from Riley in any way possible" even though many different means had been used
 
 
 [23]
 We note that at least two district courts have construed "a pattern of racketeering activity", as used in the Act, to require that the two or more acts of "racketeering activity" be interrelated. United States v. White, 386 F.Supp. 882, 883-84 (E.D.Wis.1974); United States v. Stofsky, 409 F.Supp. 609, 614 (S.D.N.Y.1973). On its face, however, the statute does not require such "interrelatedness", and we can perceive no reason for reading it into the statutory definition, 18 U.S.C. § 1961(5). "There is no constitutional principle that would prevent Congress from labeling the commission of two crimes within a specified period of time and in the course of a particular type of enterprise a 'pattern' of activity, whether or not a sequence of two similar acts amounts to a pattern as that term is ordinarily understood. Further, Congress is constitutionally entitled to make such behavior an independent criminal offense, punishable more severely than simply twice the penalty for each constituent offense." United States v. Field, 432 F.Supp. 55, 60-61 (S.D.N.Y.1977). We note also that the Act does not criminalize either associating with an enterprise or engaging in a pattern of racketeering activity standing alone. The gravamen of the offense described in 18 U.S.C. § 1962(c) is the conduct of an enterprise's affairs through a pattern of racketeering activity. Thus, the Act does require a type of relatedness: the two or more predicate crimes must be related to the affairs of the enterprise but need not otherwise be related to each other
 
 
 [24]
 Although Perez was a hybrid case, involving a wheel conspiracy in which each spoke was itself a chain conspiracy, we applied the interdependence rationale to find a single, overall conspiracy. Perez involved a series of fraudulent insurance claims based on several staged car accidents involving different groups of people, with minimal overlap among the groups. The scheme could not be described as a "chain" in the ordinary sense, but we noted that each participant had to realize that the single fraudulent claim in which he or she was involved could not be profitable unless it was one of multiple claims and that, in turn, multiple claims could not be successfully made unless they involved many different people and accidents in different locations across the state
 
 
 [25]
 See, e. g., United States v. Morrow, 537 F.2d 120 (5th Cir. 1976) (conspiracy to distribute stolen and counterfeited securities); United States v. Morado, 454 F.2d 167 (5th Cir. 1972) (country-wide conspiracy to steal an election); United States v. Nasse, 432 F.2d 1293 (7th Cir. 1970), cert. denied 401 U.S. 938, 91 S.Ct. 928, 28 L.Ed.2d 217 (1971) (conspiracy to steal and distribute cars); United States v. Palermo, 410 F.2d 468 (7th Cir. 1969) (conspiracy to extort money)
 
 
 [26]
 See, e. g., United States v. Gonzalez, 491 F.2d 1202 (5th Cir. 1974); United States v. Bynum, 485 F.2d 490 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); Sigers v. United States, 321 F.2d 843 (5th Cir. 1963)
 
 
 [27]
 Cf. Developments in the Law Criminal Conspiracy, 72 Harv.L.Rev. 920, 929-33 (1959)
 
 
 [28]
 "Although some members of the conspiracy did not engage in every transaction, such proof is not required to establish a conspiracy". United States v. Felts, 497 F.2d 80, 82 (5th Cir. 1974)
 
 
 [29]
 United States v. Palermo, 410 F.2d 468, 470 (7th Cir. 1969)
 
 
 [30]
 See note 28 supra and accompanying text. These observations apply with equal, if not greater, force to defendants Delph and Taylor who, in addition to committing several acts of racketeering activity, actually admitted to others that they were part of an ongoing enterprise. Similarly, while Recea Hawkins' acts hardly establish him as the "brains" of the enterprise, his support for the enterprise's affairs was more than mere acquiescence or presence; among his other crimes, he committed murder for the enterprise
 
 
 [31]
 Although the evidence here supports the inference that each remote member of this enterprise knew he was a part of a much larger criminal venture, we do not wish to imply that each "department" of the enterprise was wholly independent of the others. A close look at the modus operandi of the enterprise reveals a pattern of interdependence which bolsters our conclusion that the functions of each "department" directly contributed to the success of the overall operation. Many of the enterprise's practices were analogous to those common in legitimate businesses:
 Investment Capital : Most of the enterprise's activities depended upon the ready availability of investment capital, or "front money", to finance the purchase of stolen goods and narcotics for eventual resale at a profit. In this sense, money brought in from one project could be used to purchase goods in another unrelated project.
 "Good Will": Part of the value of a business is the reputation it has established in the community, its "good will". The enterprise here benefited from a negative form of "good will". For example, Foster and J. C. exploited their cooperation in the Sparta nursing home arson to gain the confidence of James Gunnells when they needed his help in concealing stolen meat; that earlier endeavor furnished proof that Foster and J. C. could be trusted in criminal pursuits. Similarly, J. C.'s threats of physical harm to many of those involved with the enterprise helped to build a fear in the community which deterred potential witnesses from going to the police. In this way, each successful criminal act and each threat contributed to the success of the enterprise as a whole.
 Arrangements to Limit Liability : Like most large business organizations, this enterprise conducted its affairs in a manner calculated to limit its liability for the acts of its agents. J. C. erroneously believed that he could limit each person's liability by keeping him as isolated from the others as possible in other words, that it would be safer to have the affairs of the enterprise conducted through chains composed of many persons playing limited roles than through a small circle of individuals performing many functions. Where overlap was unavoidable, the enterprise's ongoing operations depended upon each member's confidence that the others would remain silent. When J. C. spoke to Joe Fuchs in January, 1976, for example, he expressed confidence that the government could never make a case against his enterprise. He was certain that James Elliott would not talk because "James is scared". He also assured Fuchs that he, J. C., and Scooter Herring would say nothing; as for Recea, "that's plum out of the question, you can eliminate that". Thus, he concluded, the only other persons who might implicate Fuchs could provide only uncorroborated accounts which would "mean nothing" in court. T. 2133-34.
 
 
 [32]
 Developments in the Law, supra, note 27, at 923-24. In Callahan v. United States, 364 U.S. 587, 593-94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961), the Supreme Court explained: "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish . . . Combination in crime (also) makes more likely the commission of crimes unrelated to the original purpose for which the group was formed". See also, United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 684, 59 L.Ed. 1211 (1915)
 
 
 [33]
 Cf. Shakespeare, Macbeth, Act III, Scene I
 
 
 [34]
 In his argument, counsel compared the trial to the Tennessee Williams play "Cat on a Hot Tin Roof", in which the central character, "Big Daddy", complains that he has been lied to all his life. At the climax of the play, Big Daddy learns that his family has concealed from him the fact that he is dying from cancer. He makes his exit mumbling, with disgust, "Yes, all liars, all liars, all lying dying liars$"
 
 
 [35]
 In cross-examining Gunnells, Mr. Goodman, counsel for J. C. Hawkins, asked whether Gunnells ever had a discussion with Bibb County Sheriff's Deputy Terry Singleton "as to how he could get Mr. Hawkins"
 A No sir, not as to how he could get him.
 Q Did you tell Mr. Singleton that you needed protection from J. C. Hawkins?
 A No sir.
 Q Did you have in your possession a machine gun?
 A No sir.
 Q Do you own a machine gun?
 MR. CAREY: Your Honor, I object to this. It's got nothing to do with this case.
 THE COURT: What does that have to do with this case?
 MR. GOODMAN: I believe, Your Honor, that this witness has made statements to other persons now, I can reserve this until we put on our case but has made statements to other persons indicating that either he was going to get my client in court or he was going to blow his head off.
 THE COURT: That's not what you asked him.
 MR. GOODMAN: I am asking him if he had a machine gun in order
 THE COURT: Suppose he had ten machine guns, what's that got to do with the case on trial?
 MR. GOODMAN: I'd like to find out, Your Honor, whether the Government has provided him with a permit for a machine gun that ordinarily would not be permitted to somebody such as myself or other people in the courtroom.
 THE COURT: Gentlemen, that has no possible relevance to this case, and the Court, therefore, suggests that you do not ask such questions. T. 355-56.
 We think, however, that it was indeed relevant whether Gunnells, while helping the government to collect evidence against J. C. Hawkins, was granted a gun permit unavailable to others. This question should have been allowed. Nevertheless, we find that the restriction in this instance was inconsequential in light of the fact that Gunnells was otherwise subjected to vigorous and thorough cross-examination by several defense counsel.
 Another contested restriction arose when counsel for Delph, Ms. Dantzler, was cross-examining car thief James Green:
 Q Ms. Dantzler: You testified yesterday about a conversation with John Taylor. Is that correct? You stated that you had been offered the Witness Protection Act and that you found it a tempting offer because you had a state case pending, isn't that correct?
 A Yes m'am.
 Q And one of the things that was discussed in the offer of the Witness Protection Act and immunity of this court was the minimal settlement of your state case, isn't that correct?
 A No m'am.
 Q Mr. Green, are you telling this Court and the jury that it was not discussed that you would receive assistance and recommendations on your state case as partial exchange?
 A Yes m'am.
 Q Then they did assist you and they did recommend, did they not, that you receive a lighter sentence?
 A No m'am.
 Q They promised you they would and then they didn't, is that what it was?
 A It was never promised to me.
 THE COURT: Ms. Dantzler, approach the Bench.
 BENCH CONFERENCE
 THE COURT: Do you have independent evidence that the prosecuting attorneys of this court made that deal?
 MS. DANTZLER: No sir, not at this time.
 THE COURT: Then you shall not ask another question about that.
 MS. DANTZLER: I have this witness' statement from yesterday that he found the Witness Protection Act attractive because "I had a state case pending".
 THE COURT: He did not say what you asked him, and you are inferring by what you asked that you can prove it, and you told me you could prove it and you cannot. I invite you to state in your place you have no proof of it.
 MR. GOODMAN: Your Honor, I think what took place in front of the jury has been enough.
 THE COURT: It may be but I asked her if she went into it if she had any proof of it and she told me she did. We are not going to have this on the part of any counsel, now. She is going to have to state it.
 END BENCH CONFERENCE
 MS. DANTZLER: By direction of the Court I hereby state in my place that apart from this witness' testimony yesterday that he had been tempted to accept the Witness Protection Act because of a pending state case, that I at the present time have no independent proof of any such deal.
 THE COURT: Thank you. T. 1112-14.
 The trial judge was incorrect in his apparent assumption that questions about possible deals with the prosecution need to be based on "independent evidence" that such deals were in fact made. "What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists". United States v. Onori, supra, 535 F.2d at 945. Any prejudice flowing from this error was minimized by two factors: (1) counsel did, in fact, ask Green about agreements affecting his pending state charges, and (2) in the disavowal of "independent evidence" ordered by the trial judge, counsel reminded the jury of Green's earlier testimony suggesting that he believed his cooperation in the federal case would work to his advantage in the state case. Since the substance of the impeaching information was conveyed to the jury, the court's restriction did not constitute reversible error. Id. at 945-46.