**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joe L. FINE and Walter F. Johnsey,
Defendants-Appellants.**

**No. 80–7987.**

United States Court of Appeals,
Fifth Circuit.
Unit B

April 27, 1981.

Rehearing and Rehearing En Banc
Denied May 26, 1981.

---

Phillip A. Wittman, Stephen H. Kupperman, New Orleans, La., for Fine.

L. Drew Redden, F. Timothy McAbee, Birmingham, Ala., for Johnsey.

J. R. Brooks, U. S. Atty., Dayle E. Powell, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before MARKEY *, Chief Judge, and HILL and THOMAS A. CLARK, Circuit Judges.

MARKEY, Chief Judge:

After a judgment of acquittal on certain counts, and declaration of a ·mistrial on other counts, Johnsey and Fine moved to dismiss the remaining counts on Double Jeopardy grounds. This appeal is from denial of that motion. We affirm.

### Background

In October 1979, following an 18-month investigation by a grand jury, a 32 page, 19-count indictment was returned. Named defendants were the Drummond Company, three of its officers (Gary Neal Drummond, Elbert A. Drummond, and Clyde Clifton Black), Walter F. Johnsey, Joe L. Fine, Eddie Herbert Gilmore, and Jack Biddle. All defendants were charged in Count 1 (the RICO count) with violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* Counts 2 through 12 charged the three company officers with mail fraud transactions with a George Jones. Count 13 charged Johnsey and the Drummonds with wire fraud transactions with First Virginia Mortgage and Real Estate Investment Trust Company. Count 14 charged Fine with using his state Senator position to extort money from Gerald. Ingle. Counts 15 through 19 charged Johnsey and Fine, in mail fraud terms, with devising, with Norman Reid, a scheme to defraud Alabama Power Company of the loyal services of its employee, Johnsey, and to deprive Alabama's citizens of their right to honest government.

Defendants Johnsey and Fine moved to dismiss Count 1 and for severance. The government strenuously opposed the motions, relying heavily on particular language in this court's opinion in *United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied sub nom. Delph v. United States,* 439 U.S. 953, 99 S.Ct. 349, 50 L.Ed.2d 344 (1978). Though the trial court expressed reservations on whether the government could sustain RICO count 1, it denied the motions. In pretrial proceedings, the trial court warned the government of the necessity of establishing the existence of an enterprise and a conspiracy. The government told the court it would first establish the existence of a conspiracy and that defendants were members of it, before introducing statements of co-conspirators. *United States v. James,* 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

After six months of discovery and skirmish,[1] trial began on May 5, 1980. In two months of virtually continuous trial, defendants and the court repeatedly asked that the government submit proof purporting to establish the existence of the "enterprise" and conspiracy required to undergird a RICO count. Exhibiting a monumental patience, expressing appropriate concern for the onerous burden on defendants, and

---

* Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. Much of which was occasioned by the extensive pretrial publicity given the case. Publicity continued during the trial. The trial court was driven, by the government's repeated failures to make timely and complete delivery of *Jenck's* materials and similar items, to state that it had become "weary of this continual bickering" over such matters.

relying on the government's repeated promises to "connect it up," the trial court permitted the government to present to the jury weeks of inflammatory testimony and exhibits relating to what the government viewed as predicate crimes without the submission of proof going to the existence of an enterprise and conspiracy.[2] On July 8, 1980, the court entered a judgment of acquittal on Count 1. On July 11, 1980, the court granted motions for acquittal on Counts 2–13, on which the government had introduced all of its evidence. Those actions left only Johnsey and Fine as defendants, and only Counts 14–19 as pending.

The government made a proffer to the court of anticipated evidence relating to counts 14 through 19. A motion of Johnsey and Fine for a mistrial on those counts was granted.

In November 1980, Johnsey and Fine moved for dismissal of counts 14 through 19, on the ground that their reprosecution on those counts would violate the double jeopardy clause of the Fifth Amendment to the Constitution. Intentional misconduct of the government was alleged to lie in its joinder of "eight defendants on wholly unrelated charges that it sought to cross fertilize under the umbrella of RICO." On November 24, 1980, the trial court orally denied the motions. On November 25, 1980, the Clerk's Minutes reflecting that decision were issued, and Johnsey and Fine noticed this appeal. On November 26, 1980, the trial court entered an order holding the motions to dismiss not to have been frivolous.

*Issue*

The sole issue before us is whether the trial court correctly determined that retrial of Johnsey on Count 14, and retrial of Johnsey and Fine on Counts 15 through 19, are not barred by the double jeopardy clause of the Fifth Amendment.

OPINION

The court is again confronted with the necessity of balancing the numerous competing interests surrounding application of the double jeopardy clause, an area of the law it has often visited. In *United States v. Kessler*, 530 F.2d 1246 (5th Cir. 1976), a case primarily relied on here by Johnsey and Fine, the court emphasized the interest in discouraging intentional prosecutorial misconduct designed to provoke a mistrial and thus produce a second and improved chance to try a defendant. In that case, the prosecutor had introduced hearsay of a person known to be unavailable and had introduced a known false exhibit, a rifle. In *United States v. Crouch*, 566 F.2d 1311 (5th Cir. 1979), and in *United States v. Garza*, 603 F.2d 578 (5th Cir. 1979), the court referred to the interest in preserving the freedom of trial courts to declare mistrials, without undue fear that an effective acquittal will result when an appellate court finds prosecutorial misconduct and orders dismissal of the indictment.

In other mistrial-double jeopardy cases in this court,[3] and in the Supreme Court,[4] other interests, expressed or no, were present

---

**2.** In a pre-trial conference, and contrary to its earlier assurance that it would establish it early on, the government argued that it had until the "close of the Government's case" to prove the existence of an enterprise and conspiracy, going so far as to recognize and accept the continuing necessity "right up to the end," for the trial court to supply repeated rulings on hearsay and other evidentiary objections, and asserting that the jury could infer existence of an enterprise from the evidence of the predicate crimes alone. Before us, the government refers to the judgment of acquittal on Count I as occurring "midtrial," apparently still under the impression that it could try defendants for another two months without submission of proof going to the existence of an "enterprise."

**3.** See, e. g., *Cherry v. Director, State Board of Corrections*, 635 F.2d 414 (5th Cir. 1981), *Baker v. Metcalfe*, 633 F.2d 1198 (5th Cir. 1981), *United States v. Opager*, 616 F.2d 231 (5th Cir. 1980). See, also, cases cited in the text.

**4.** See, e. g., *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The Supreme Court has rejected the concept of a "rigid, mechanical rule," for application to double jeopardy and retrial questions. *Illinois v. Somerville*, 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed. 425, 432 (1973). See, also, cases cited in the text.

and to varied degrees influential, e. g., the accused's interest in preserving his or her right to a fair trial, the public's interest in maintaining the integrity of the judicial process by discouraging undue profit to either accused or accuser in requesting or provoking a mistrial, the societal interest in having the issue of a defendant's guilt or innocence litigated, and the public interest in assuring that a prosecutor's proper parameters of performance do not expand into a prosecutor's vicious vendetta of vindictiveness.

Present also is the deference due the determination of the trial judge, infinitely more familiar than are we with all actions, words, and attitudes of the actors in the eight-month drama played before him. Presented with opposing critical reviews of that drama, containing only those segments favoring each critic's evaluation, we can but look for clear evidence that the first reviewer, who was on the scene, was wrong.

Before us, the parties devote their briefs and argument primarily to a review of the prosecutor's actions, from convening the grand jury on. Johnsey and Fine, refusing any role to human frailty, honest mistake, or incompetence, cite apparent shortcomings in the prosecutor's evidence, in its presentation to the grand jury and the court, in the prosecutor's broken promises to the court, and in the prosecutor's questioning of witnesses. All of that, they say, stemmed from either gross negligence or from an intentional and improper prosecutorial design to convict at all costs.

Johnsey and Fine thus emphasize society's interest in even-handed, objective prosecution limited to the facts and the law. The government explains its conduct in this case as stemming from its duty to prosecute a grand jury's indictment,[5] from an honest belief that this court's opinion in *Elliott* authorized joinder of these eight defendants and 18 counts under a RICO count, and from a sincere belief that a jury could infer existence of an enterprise from evidence of separate crimes.[6] In sum, Johnsey and Fine attribute improper motives to the prosecutors and the government asserts an unassailable prosecutorial purity.[7]

Johnsey and Fine have been subjected to a very expensive ordeal, having survived an eighteen month grand jury investigation, six months of pretrial proceedings, a two month trial, and the prosecutor's resistance to this appeal.[8] Their motion to dismiss counts 14–19, as was said in relation to a mistrial request in *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), has as its objective—"The avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions." Their plight, in light of what they view as an unnecessary RICO prosecution occasioned only by prosecutorial mischief, creates an emotional aura of sympathy.[9] Moreover,

---

5. The prosecutor's implication of complete divorcement from the indictment, and of a duty to enforce every indictment however unfounded, is at best inappropriate.

6. Though recognizing that it has no right to appeal an acquittal, and without reference to acquittal as reflecting innocence in the eyes of the law, the government devotes a substantial segment of its brief and argument to assertions that various defendants did perform the acts of which they were acquitted.

7. Both parties' briefs are replete with unseemly and unhelpful characterization of opposing counsels' motives. Because the court is concerned with application of law to established facts, not with motives impossible with certainty to fathom, pejoratives are purposeless.

8. The government sought unsuccessfully below to consolidate this case with cases based on indictments for violation of the Internal Revenue Laws. The tax indictment of Johnsey has been entirely dismissed. Four of five tax counts against Fine have been dismissed. In a colloquy with the court, the prosecutor indicated that the remaining tax count against Fine would probably not be tried.

9. The government says it informed attorneys for Johnsey and Fine of their right to appeal the denial of their motion to dismiss counts 14–19 on double jeopardy grounds. It nonetheless attacked this appeal, in its Motion For An Expedited Appeal in this court, as "spurious" and brought "in bad faith" for the "sole purpose of delay." At oral argument, the government requested almost immediate disposition of this appeal. As reflected in the text, the interests involved and facts of record compel careful, contemplative consideration and preclude a rush to judgment.

the interest of Johnsey and Fine in being free of prosecutor-produced multiple prosecutions must weigh heavily in the scales. Their present motion, however, must be decided on the facts and established decisional tools applicable to double jeopardy questions.

A primary tool, controlling here, looks to the cause of the mistrial. When that cause lies in action of the prosecution, whether it forces defendant to request mistrial or produces a *sua sponte* court declaration, the touchstone lies in analysis of that action. Mere error, though it may justify a mistrial, will not normally form a basis for dismissal. The prosecutorial action causing a mistrial must descend to the level of intentional misconduct, gross negligence, or "prosecutorial overreaching." [10]

In analyzing the prosecutor's actions here, we look only to those heard or observed by the jury, that is, those actions that so tainted or prejudiced the jury as to have forced the defendants to forego their right to go to that jury "and, perhaps, end the dispute then and there with an acquittal." *United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971).[11]

10. See the cases listed in notes 3 and 4, supra. Though the government argues that Johnsey and Fine were not forced to seek a mistrial, the record of inflammatory material it presented to the jury makes clear that the risk of continuing with that jury was so overwhelming as to effectively force a motion for mistrial.

11. Johnsey and Fine cite numerous actions of the prosecution unknown to the jury, in an apparent effort to paint a picture of overall prosecutorial intent. However, egregious may be such out-of-court actions, however closely they may skirt the edge of overreaching, they could supply no basis for dismissing counts 14–19 unless they somehow affected the trial. See *United States v. Morrison*, —— U.S. ——, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).

12. The parties dispute whether evidence touching counts 14–19 was introduced at the trial. The dispute is irrelevant, double jeopardy becoming fixed, if it does, when a jury is selected and sworn at the first trial. *United States v. Jorn*, 400 U.S. 470, 479–80, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971), *Downum v. United States*,

The prosecutorial actions before the jury relied on by Johnsey and Fine included errors in evaluating and presenting evidence and in questioning a witness. We have reviewed each with care. It cannot be said on this record whether those errors were caused by inexperience or negligence. It can, however, be said that if they resulted from negligence, it was not such gross negligence as to warrant dismissal of counts 14–19.[12] The prosecutorial errors cited are to be decried but not graded at the level of intentional misconduct, gross negligence, or prosecutorial overreaching. In all events, those errors cannot be described as designed and intended to provoke a mistrial, nor do Johnsey and Fine so describe them.

Indeed, Johnsey and Fine place their greatest if not total reliance on the prosecutor's action in deliberately and intentionally obtaining, and adamantly pursuing, an indictment of eight defendants under a RICO count the prosecutor knew or should have known was without foundation.[13]

Recognizing at oral argument the inability of the record to establish that the prosecutor employed the RICO count for the purpose of provoking a mistrial, Johnsey and Fine argue for a holding that a prosecutor's action designed to improve his or her

372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), *Green v. United States*, 355 U.S. 184, 188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957), *Wade v. Hunter*, 336 U.S. 684, 688, 69 S.Ct. 834, 836, 93 L.Ed. 974 (1949).

13. The government argues that the characterizations of "deliberate" and "intentional," and the allegation that prosecutors "knew" a RICO foundation was lacking, are newly presented to this court, and that argument below on the motion to dismiss rested on the mere bringing of the RICO charge. Johnsey and Fine from the very start asserted the absence of foundation, and the trial court from pre-trial proceedings onward questioned whether a foundation existed. Nonetheless, we cannot on this record look into the prosecutors' minds and determine that bringing and maintaining a RICO count, though misguided, was not sincerely believed to be a proper action, or that the prosecutors did not sincerely believe that Johnsey, Fine, and the trial court were simply wrong and they were right.

chances of obtaining a conviction should produce the same result as one designed to provoke a mistrial. That brush sweeps too broadly, for many proper actions of the prosecutor are presumably designed to enhance the odds on conviction. The issue is not whether the prosecutor's blows were hard, but whether they were foul. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

■ Johnsey and Fine assert that the prosecutor here employed an unwarranted interpretation of *Elliott* to justify joining these eight defendants, and, by submitting extensive evidence of predicate crimes unrelated to each other, sought thereby to improve the chance of convicting all defendants on the RICO count. Assuming the correctness of that assertion,[14] a prosecutor's misinterpretation of a court opinion, without more, and whether the interpretation would or would not improve the chance of conviction, does not descend to the level of intentional misconduct, gross negligence, or prosecutorial overreaching sufficient to warrant dismissal of an indictment.[15]

### Conclusion

In *Kessler*, supra, intentional misconduct and egregious overreaching of the prosecutor before the jury resulted in dismissal of the indictment. The public interest in maintaining the integrity of the judicial process and of the office of prosecutor was there paramount. The prosecutor's actions here complained of do not descend to the level of those in *Kessler*, and the public interest in assuring that criminal charges be fairly and fully tried to a conclusion of conviction or acquittal, "the public's interest in fair trials designed to end in just judgments," *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), outweighs the competing interests asserted.[16]

*AFFIRMED.*

---

14. The government persists in asserting before us the correctness of its interpretation of *Elliott*, and attributes its failure on Count 1 below to the trial court's "narrow" interpretation of the opinion in that case. The issue below was never, however, whether numerous defendants may be joined under a RICO count. The issues were whether there was in *this* case sufficient evidence of an "enterprise," and whether the government followed the proper *order of proof* of existence of that enterprise. *Elliott* did not delete the requirement for proof of the existence of an enterprise under RICO, nor did it effect the preference expressed in *James* for establishing the enterprise early on at the trial.

15. It is not argued that the prosecutors intentionally employed a knowingly false RICO count to get a second chance at proving the predicate crimes when the RICO count failed and a mistrial was declared on the counts charging the predicate crimes. Johnsey and Fine do point to the prosecutors' statement that they would "still" have the other counts when the trial court asked where they would be if the RICO count failed, but there is no evidence that the prosecutors' "still" encompassed more than the one prosecution. Presumably, the courts would cast a heavily jaundiced eye upon an abusive employment of the RICO statute in which it is used solely as a means of insuring multiple prosecutions of separate crimes.

16. It need hardly be said that our affirmance implies nothing whatever relating to the validity of the charges embodied in counts 14–19. We are confident that the prosecutors will recognize that, like all defendants, Johnsey and Fine are presumed innocent of those charges, unless and until they are proved guilty thereof in the due process of law.